UNITED STATES, Appellee,

v.

Daniel Joseph MARAVILLA,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Rafael Jesus DOMINGUEZ,
Defendant, Appellant.

Nos. 88–1061, 88–1062.

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1990.

Decided June 28, 1990.

David Shaughnessy, Boston, Mass., with whom John Wall and Law Offices of John Wall, Washington, D.C., were on brief, for defendant, appellant Maravilla.

Benjamin S. Waxman with whom Robert G. Amsel and Weiner, Robbins, Tunkey & Ross, P.A., Miami, Fla., were on brief, for defendant, appellant Dominguez.

Lisa J. Stark with whom Jessica Dunsay Silver, Civil Rights Div., Appellate Section, Dept. of Justice and James P. Turner, Acting Asst. Atty. Gen., Washington, D.C., were on brief, for appellee.

Before BREYER, ALDRICH and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

A jury has found that, on September 10, 1982, two United States Customs officers kidnapped a Dominican money courier as he entered the United States, murdered him, and stole about $700,000 that the courier intended to deposit in a Puerto Rican bank that afternoon. The federal government did not charge them with murder, however, for murder ordinarily is a state, not a federal, crime. Rather, the government indicted them for, and the jury convicted them of: (1) depriving an "inhabitant of any State, Territory, or District" of a civil right, 18 U.S.C. § 242, (2) engaging in "robbery" and committing acts of "physical violence" affecting interstate commerce, 18 U.S.C. § 1951(a), (3) transporting stolen money interstate, 18 U.S.C. § 2314, and (4) receiving or concealing stolen money that has moved interstate, 18 U.S.C. § 2315. In addition, the jury convicted each officer of two separate charges involving lying and obstruction of justice.

The two defendants appeal, arguing that the district court made several evidence-related errors. They also claim that, regardless, the government could not convict them of violating the civil rights statute because the victim, a citizen of the Dominican Republic, was not an "inhabitant of any State, Territory or District" of the

United States. We find their evidence-related claims unconvincing, but we agree that the victim—a foreign citizen who intended to stay in the United States for only a few hours—was not an "inhabitant" of this country. We therefore affirm the robbery-related convictions, but we reverse the conviction under 18 U.S.C. § 242.

## I. Evidence–Related Claims

### A. Sufficiency of the Evidence

■ Appellants claim that the evidence is not sufficient to "warrant a jury to conclude" that they are "guilty" of the crimes charged "beyond a reasonable doubt." *United States v. Rivera Rodriguez*, 808 F.2d 886, 890 (1st Cir.1986). In assessing the legal merits of their claim, we must take "the view" of the evidence "most favorable to the government;" that is to say, we must assume witness credibility findings that favor the government and we must draw all reasonable inferences in its favor. *See United States v. Cintolo*, 818 F.2d 980, 983 (1st Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); *United States v. Anello*, 765 F.2d 253, 262 (1st Cir.), *cert. denied*, 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985). Having done so, we conclude that a reasonable juror could find them guilty beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *accord United States v. Guerrero–Guerrero*, 776 F.2d 1071, 1073 (1st Cir.1985), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). The evidence that leads us to this conclusion, as summarized, includes the following:

First, there is evidence that the defendants had a special opportunity to commit the crime. The money courier, Yamil Mitri Lajam, arrived at Puerto Rico's airport on September 10, 1982, around midday. He presented customs forms showing he was carrying $370,000 in cash and $323,000 in checks (belonging to the Dominican foreign exchange business for which he worked). An inspector referred him for an interview to one of the defendants, customs officer Rafael Dominguez. Dominguez walked over to the other defendant, customs officer Daniel Maravilla, who, together with an FBI agent, was in the midst of another interview. Maravilla left the agent, joined Dominguez with the victim Mitri for a few minutes, returned to the agent, left again for a few minutes, and returned to the agent again, this time telling the agent that he (Maravilla) and Dominguez had finished interviewing the victim. In the meantime Dominguez and the victim walked back to the first inspector for further processing and then left the customs office together. About the same time Maravilla left the customs office. Dominguez returned to the customs office about five hours after he left it; Maravilla returned the next day. After the victim Mitri left the office with Dominguez, no one ever saw him alive again. He was shot to death; his body was found (without the money) ten days later, about 20 miles from the airport, in a state of decomposition consistent with his having been killed during the five hours that both Dominguez and Maravilla were away from the customs office.

Second, Dominguez and Maravilla had special knowledge about the money. They had interviewed Mitri and therefore knew about the money he was carrying. Mitri had planned to deposit the money in a San Juan bank that afternoon and return immediately to the Dominican Republic. Thus, there is reason to believe that few others in Puerto Rico knew about the money he was carrying.

Third, Dominguez and Mitri, who had little money before September 10th, had large quantities of money immediately thereafter. As of September 10th, their bank accounts each showed balances of less than $100; their salaries amounted to $37,000 and $34,000 per year respectively; yet, on the very evening of September 10th they bought first class plane tickets and flew to Miami, bringing with them a briefcase filled with about $265,000 in cash. Within a week Dominguez gave a girlfriend $7000 cash, bought $3500 in postal money orders, and, through a friend, deposited $5000 in a Miami bank account. In October he gave an uncle $15,000 to buy a new car for him. In February he agreed to make a

cash down payment of $30,000 for a new house. Similarly, within a week of September 10th, Maravilla deposited $18,300 cash in his bank account in San Juan, gave $2000 to his parents, and, through a friend, deposited $2000 in a Miami bank account. The following February he flew to Colombia with $53,700 cash.

Fourth, the defendants tried to hide their cash. After flying to Miami on September 10th, they contacted Wayne Sausmer, a friend of Maravilla's, and paid him $12,000 to take $220,000 cash to Panama and deposit it in numbered, unnamed bank accounts.

Fifth, the defendants made up false stories about the money. When, some months later, Maravilla was stopped at the Colombian border with $53,700 cash, he said he did not know he was supposed to declare cash (though his United States customs job involved interviewing persons who made similar declarations) and that the cash was an inheritance. Subsequently, he and Sausmer agreed that, if questioned about the cash, they would say it came from another friend, Sultan Benyi, who had given or loaned Maravilla the money. Maravilla and Sausmer later repeated this story to the FBI; Dominguez discussed the story with Sausmer and repeated it before a grand jury. After it became apparent, however, that Benyi himself would not confirm this story, Maravilla and Sausmer decided to say that the cash came from a Panamanian businessman named Herman Maussinger, who (they said) had loaned it to Maravilla before he (Maussinger) died. Eventually Sausmer told the FBI, the grand jury, and the jury below in this case, that these stories were all false.

Sixth, in the week following September 10th Dominguez asked a friend to take his gun to Miami and to have a new barrel put on the gun.

We recognize that this evidence is circumstantial. Moreover, the record contains some contrary circumstantial evidence, consisting of (a) the fact that Sausmer had taken out a $70,000 letter of credit in Maravilla's behalf a few months *before* September, (b) the fact that Maravilla's

bank account showed transactions totalling $50,000 a few months *before* September, (c) the testimony of a friend of Dominguez, to whom he owed about $2500, that Dominguez called her *before* September 10 and told her that he was sending money orders to repay the loan, and (d) the fact that the Miami gunsmith did not put a new barrel on Dominguez's gun (a gun which no one introduced into evidence).

Neither the circumstantial nature of this evidence, however, nor the theoretical possibility that it is consistent with innocence, not guilt, is sufficient ground for overturning the jury verdict. Circumstantial evidence, when strong, can prove guilt. The question is whether we can say that *no* reasonable juror could find that the evidence of timing, of special opportunity, of special knowledge, of the money's sudden appearance, of the false stories, of the gun, taken together, demonstrate guilt beyond reasonable doubt. We cannot say that no reasonable person could take such a view; thus, we cannot second guess the jury's verdict, and therefore must uphold it as a matter of law. *See, e.g., Guerrero-Guerrero,* 776 F.2d at 1073.

### B. *The Expert Testimony*

The government presented testimony by two forensic pathologists. The first, Dr. Criado, testified that, in his opinion, the victim died between September 8 and September 12. The second, Dr. Davis, testified, on the basis of photographs of the body when found on September 20, that he thought, "from appearance, considering the nature of the environment," the person had then "been dead ... one or two weeks." The prosecutor then asked the following additional questions:

Q. Would you consider in making a determination as to time of death that the victim had no one waiting to meet him at the airport to take him directly to the bank?

MR. CASTRO: Objection. Completely speculative.

THE COURT: Rephrase the question.

Q. Would you consider as evidence in making a determination as to the [time]

of death that the victim had no one waiting at the airport to take him to the bank?

THE COURT: Overruled. You may answer.

THE WITNESS: Yes, I would.

....

Q. Would you consider as evidence in making a determination as to the time of death that the victim was carrying over three hundred and seventy-five thousand dollars in cash when he disappeared on 9/10/82, and that that same evening on 9/10/82 the last person seen with the victim began spending large sums of money?

A. I would take that into consideration.

MR. AMSEL: Same objection.

THE COURT: Overruled.

Q. Would you consider as evidence in making a determination as to the time of death that the victim was killed by a gunshot and that the last person seen with the victim alive had a gun?

A. That would be—

MR. AMSEL: Same objection.

THE COURT: Overruled.

THE WITNESS: That would be additional information I would receive, yes.

Q. ... assuming all those facts to be true, what is your opinion as to the date of death of the victim, Yamil Mitri Laham?

MR. AMSEL: Objection.

THE COURT: Overruled.

THE WITNESS: In my opinion the date of death logically would be September 10, the day that he disappeared.... The evidence that I have heard from you indicates a time frame that is being narrowed down to the middle portion of the day of September 10. The condition of the dead body in these photographs certainly is consistent with that time frame as well.

The defendants argue that the district court should not have permitted Dr. Davis to answer these quoted questions, on the grounds that they are not relevant, Fed.R. Evid. 402, that, regardless, the "danger of unfair prejudice" outweighs any relevance,

Fed.R.Evid. 403, and that, in any event, the answers did not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

In our view, the answers are relevant, for they tend to demonstrate that death occurred on September 10th, the day that the defendants interviewed the victim at the customs office. The more difficult questions concern "prejudice" and "assist[ing] the trier of fact." The problem is that these questions and answers, considered by themselves, out of context, might suggest to the jury that the expert, Dr. Davis, thought, on the basis of some *scientific* expertise, rather than on the basis of such commonplace circumstantial evidence such as the date of the victim's disappearance, that death occurred on September 10 *exactly*. In fact, Dr. Davis's opinion, insofar as it went beyond *approximate* dates of death, rested upon no more than the common sense, circumstantial information that the jury could assess as easily as the doctor.

When one reads the testimony in context, however, the risk of jury confusion seems fairly small. Dr. Davis began his testimony by explaining that a forensic pathologist's expert opinion does *not* rest upon expert information alone. Rather, he said that his job, as an expert pathologist was to consider both the condition of the body *and* various pieces of ordinary, nonexpert circumstantial (or direct) evidence that pointed to a particular time of death. He said that his basic role was to decide whether the physical condition of the body was *"consistent with"* the time of death to which the other evidence pointed. He testified, for example, as follows:

What's more precise is information pertaining to what the person was doing or expected to do and that is interrupted.... We look into what the habits are of that person and if there is an interruption of habit it is usually something that happened to them so that they can't carry out their daily routine.... *In fact, the way we do it actually is we look at all the circumstances surrounding the death, and then we examine and look*

*at the body and see if the condition of the body is consistent with that particular set of circumstances. We find it more accurate to use that approach than if you just start at a dead body and make a guess as to when the person may have died.*

(Emphasis added.) He gave other similar testimony.

With this background, the jury would have understood most of the prosecutor's questions as simply asking whether the expert normally took into account circumstantial evidence, such as the dates when the victim was last seen alive. As Dr. Davis explained, he normally did take such evidence into account, along with facts about the state of the body, in determining the date of death. Nothing in the record suggests that a forensic pathologist acts improperly, or in any nonexpert capacity, in doing so.

Dr. Davis went on to testify that

The evidence that I have heard from you indicates a time frame that is being narrowed down to the middle portion of the day of September 10. The condition of the dead body in these photographs certainly is *consistent* with that time frame as well.

(Emphasis added.) This conclusion, too, in light of the background about how Dr. Davis did his job, seems a perfectly proper expert conclusion.

We concede that several additional passages suggest Dr. Davis was trying to say more. He testified, for example, "In my opinion the date of death logically would be September 10, the day that he disappeared," and he repeated this more absolute conclusion later on. However, defendants did not object to these more isolated statements separately; and the district court could reasonably conclude that the *entire* set of questions and answers, as objected to, did not mislead the jury. That is to say, the court could have concluded that, in context, the jury would have understood the testimony as illustrating the precise process that Dr. Davis outlined in advance, namely, an expert's use of circumstantial evidence, together with views of

the body, to determine whether the body's condition was consistent with the time of death that the other evidence tended to indicate.

The district court has considerable leeway, under Fed.R.Evid. 403, in determining the overall prejudicial effect of such testimony and to weigh it against probative value. *See, e.g., United States v. Simon,* 842 F.2d 552, 555 (1st Cir.1988). Similarly, the district court has considerable leeway, under Fed.R.Evid. 702, in determining whether or not an expert's testimony will "assist the trier of fact to ... determine a fact in issue." We cannot say that, in admitting the evidence, the court went beyond those powers.

### C. *Testimony about the Gun*

■ After presenting evidence that a gunshot killed Mitri, the government introduced evidence showing (a) that Dominguez owned a gun, (b) that a week after Mitri's death, he asked a friend to bring his gun to a Miami gun shop to have the barrel replaced, (c) that the shopowner saw scratches on the barrel, which could have been left by an attempt to remove it, and (d) that the shopowner repaired the barrel but did not replace it. The defendants point out that Dominguez, as a customs officer, had to own a gun. They argue, in light of that fact, that the evidence presented of ownership and about barrel replacement was irrelevant and prejudicial.

We do not see how one could say the evidence is irrelevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Obviously, the fact that Dominguez owned a gun makes his guilt somewhat more probable than if he did not own a gun. The fact that he might have had a good reason, consistent with innocence, for owning a gun, makes the evidence less probative, not irrelevant. Regardless, the government had to show that Dominguez owned a gun in order to show that he tried to have the barrel replaced. The effort to replace, in turn, suggests an

effort to eliminate features of the gun that might have linked it with a bullet eventually found in, or near, Mitri's body. And any such effort suggests consciousness of guilt. Given this set of logical connections, the replacement effort makes guilt more probable than had there been no replacement effort; and the evidence, consequently, is relevant.

The defendants point out that the chain of inferences is far weaker than if the government had introduced the gun itself into evidence, for then experts could have tested it to see if it matched the bullet that killed Mitri. The record provides no basis, however, for concluding that the government ever found the bullet. Thus, the weaker evidence may have been all that the government had available. *Cf. Commonwealth v. Bonomi*, 335 Mass. 327, 140 N.E.2d 140, 152 (1957) (evidence that defendant had thrown into a fire a piece of iron which could have been used to commit the murder with which he was charged was admissible even "without direct proof that the particular instrument was in fact the one used"); *State v. Hawkins*, 70 Wash.2d 697, 425 P.2d 390, 396 (1967) (evidence that knife belonging to the defendant had been found about a block from where he lived (and where the murders with which he was charged were committed) was admissible even though no direct evidence that the knife had been used to commit the murders), *cert. denied*, 390 U.S. 912, 88 S.Ct. 840, 19 L.Ed.2d 883 (1968). Regardless, the government is perfectly free to introduce weak, as well as strong, evidence. *See, e.g.*, Fed.R.Evid. 401 advisory committee's note ("The standard of probability under the rule is 'more ... probable than it would be without the evidence.' Any more stringent requirement is unworkable and unrealistic."); Cleary, *McCormick on Evidence* § 185, at 542–43 (3rd ed. 1984) ("Under our system, molded by the tradition of jury trial and predominantly oral proof, a party offers his evidence not *en masse*, but item by item. An item of evidence ... need not prove conclusively the proposition for which it is offered.... A brick is not a wall.") (citations omitted). No one claimed that this particular piece of evidence

*proved* guilt. It was merely one piece of evidence among many. Nor do we see how introduction of this evidence either wasted the court's time or suggested "decision on an improper basis." Thus, in our view, the district court could properly admit it under Fed.R.Evid. 403.

### D. *Evidence of Maravilla's Prior Smuggling*

Appellants argue that the district court should have excluded testimony by Maravilla's friend Sausmer that in 1980 Maravilla helped Sausmer smuggle gold statues through the airport by meeting him at customs, taking him out a back door, and driving him through a security checkpoint. They say that Fed.R.Evid. 404(b) forbids the admission of such "bad character related" evidence; and that, in any event, it fails the "probativeness vs. prejudice" test of Fed.R.Evid. 403.

■ Appellants are wrong about the first point. Fed.R.Evid. 404(b) forbids admission of "evidence of other crimes ... to prove the character of a person in order to show action in conformity therewith," but it specifically permits the admission of such evidence for "other purposes, such as proof of ... opportunity...." To show "opportunity" is to show that the defendant had some special capacity, ability or knowledge that would enable him to commit the crime. *See generally* 22 C. Wright & K. Graham, *Federal Practice & Procedure: Evidence* § 5241, at 484–486 (1978 & Supp.1989). Here, the district court specifically admitted the evidence of Maravilla's surreptitiously whisking Sausmer through customs and the checkpoint to show that he had the ability to have done the same with the victim Mitri. And the district court specifically instructed the jury that it was to consider the evidence only for this purpose, not for the purpose of showing character.

■ Appellants' Rule 403 argument presents a much closer question. That rule says that a district court "may" exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403.

Of course, appellate courts give district courts considerable leeway in assessing "probative value," "prejudice," and weighing the one against the other. *See, e.g., Simon*, 842 F.2d at 555 (1st Cir.1988). Yet, still, one might ask, was not the legitimate "probative value" of this evidence very small? After all, would it not have been obvious to a jury, even without the evidence, that the customs officers could have driven Mitri away from the airport? And, one might add, was its "prejudicial" effect not significant? After all, it made clear to the jury that Maravilla had a rather bad character.

In answering these questions we have taken account of the following special features of the record. First, defense counsel for Maravilla did, in fact, make a point about Maravilla's possible inability to sneak Mitri out of the airport. In his opening statement he said,

> Did the government ever tell you that anyone here, that anyone saw Daniel Maravilla kidnap Yamil Mitri? There will be no evidence as to that.... No one will be able to say and no one will testify that they saw Yamil Mitri in a car with Daniel Maravilla leaving the airport.

He then said, in his closing statement,

> Not one person has come to this court and said I saw Daniel Maravilla leave with Yamil Mitri on the morning of September 10, 1982 out of this airport. Not one person of that whole enclosure came to this court and said I saw Yamil Mitri with Daniel Maravilla in the lobby of the customs enclosure.
>
> Now if you will recall, the supervisor stated that in the parking lot where the agents have their cars, that you have to go out through a checkout point and that there is a guard manning that checkout point and he is the one that lets cars in and out. He makes sure that only authorized personnel can go into that parking lot. Where is the guard? Did any guard come here and say on September 10, 1982, I saw Daniel Maravilla with Yamil Mitri Lajam? No one did. And that is significant, ladies and gentlemen of the jury, because we're talking about an

event that occurred in broad daylight with many people, agents. Strange that no one has seen Daniel Maravilla with Yamil Mitri on that day.

These statements suggest that Maravilla's ability to get Mitri past the checkpoint was in issue, suggesting a need for some response; the past "smuggling" evidence, showing that it was not very difficult to drive an unauthorized person past the checkpoint (suggesting, perhaps, that the checkpoint was sometimes unattended), offers, at least, a weak response.

At the same time, the added prejudicial effect of the smuggling evidence is weakened by the fact that the government introduced, without objection, evidence that Maravilla had been arrested for failing to declare income, evidence that, by itself, suggested bad character. Of course, one might argue that smuggling shows an even worse character; but the distance between smuggling and murder is great, far greater, perhaps, than the distance between tax evasion and smuggling; thus, the incremental "bad character" harm of showing that a tax evader is also a smuggler would (on the logical path towards proving murder) seem fairly small.

Taking account of these two factors (suggesting some particular legitimate probative value and some lessened prejudicial effect), the proper jury instructions, and the considerable legal leeway the district court enjoys in making Rule 403 determinations, we cannot say that its decision to admit this evidence amounts to legal error.

## II. *"Inhabitant"*

■ The government charged the appellants, and the jury convicted them, not only of robbery-related crimes, but also of violating 18 U.S.C. § 242, which says,

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any *inhabitant of any State, Territory, or District* to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments or penalties on account of such individual being an alien, or by

reason of his color or race, than are prescribed for the punishment of citizens, is guilty of a crime. The appellants point out that the record shows that the victim, Mitri, was a citizen of the Dominican Republic, that he entered the United States on the morning of September 10, 1982, and that he intended to leave the United States that same afternoon. They say that a foreign person who visits the United States very briefly, one who does not intend to stay even overnight, one, rather, who intends to stay within the United States for no more than a few hours, is not an "inhabitant" of the United States. Hence, whatever *other* statutes appellants may have violated, they did not violate this one.

We agree with the appellants. We are willing, for the sake of argument, to make many of the assumptions about this statute that the government urges. We assume that Congress intended it to have a broad scope and to protect aliens. We assume that the statute, though criminal, is (in part) jurisdictional in nature, permitting the federal government to prosecute behavior that perpetrators know to be criminal (such as murder), and that consequently courts might give its language a broad interpretation without running afoul of "due process" "fair notice" requirements. *See Screws v. United States*, 325 U.S. 91, 128, 65 S.Ct. 1031, 1048–49, 89 L.Ed. 1495 (1945) (Rutledge, J., concurring) (Defendants convicted under predecessor of 18 U.S.C. § 242 "were not puzzled to know for what they were indicted.... They simply misconceived that the victim had no federal rights and that what they had done was not a crime within the federal power to penalize. That kind of error relieves no one from penalty.") (footnote omitted); *cf. United States v. Robinson*, 843 F.2d 1, 4–7 (1st Cir.1988) (holding that when defendants knew that their conduct was unlawful, the fact that they did not know that the United States would prosecute them for it did not mean that they lacked "fair notice" under due process or ex post facto clauses), *cert. denied*, 488 U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988). We assume that courts, in the past, have interpreted the word "inhabitant" to cover a range of different relationships between a person and a place. *See, e.g., Walnut v. Wade*, 103 U.S. 683, 694, 26 L.Ed. 526 (1880) (approval of bonds by "inhabitants" of a town meant approval by a majority of the legal voters); *Burch v. Burch*, 195 F.2d 799, 804 (3d Cir.1952) ("inhabitant" in Virgin Islands divorce law means "domiciliary"); *Standard Stoker Co. v. Lower*, 46 F.2d 678, 683 (D.Md.1931) ("inhabitant," "resident," and "citizen" are equivalents); *Holmes v. Oregon & California Ry. Co.*, 5 F. 523, 526 (D.Or.1881) ("inhabitant" and "domiciliary" are not synonymous); *Harris v. Harris*, 205 Iowa 108, 215 N.W. 661, 663 (1927) ("inhabitant," "resident," and "citizen" "are not necessarily coextensive, consistent, or synonymous"). Still, no court that we know of has ever used that word to apply to so temporary a foreign visitor as Mitri, one who lacks an intent even to spend a night. And we simply do not see how we could apply the word "inhabitant" to such a person without radically distorting its meaning, as that meaning is found both in ordinary language and in the law.

In reaching this conclusion, we have taken account of the following: First, we have examined dictionary definitions of the word "inhabitant," definitions found both in general and legal dictionaries, both modern dictionaries and nineteenth century dictionaries current when Congress wrote this statute. All of them define the word in terms of "dwelling" in a place, which, in turn, they define in terms of "living in," "having a habitation in," or "residing in," a place. None of these terms can be used to describe a daytime visit by one who lives elsewhere.

Second, we have searched the United States Code to try to find any legal use of the word "inhabitant" that might cover such a visitor. Using an on-line computer research service, we located 140 instances in which the word occurs either in the United States Constitution or in federal statutes. We could not find a single instance that would seem to apply to so temporary a visitor. To the contrary, the most famous use of the word, in the Constitution's requirement that Senators and

Representatives be "inhabitants" of the state that elected them, would clearly not apply to a temporary visitor. *See* [Case of] Pigott (1863), in D. Bartlett, Cases of Contested Elections in Congress 463, 464 (1865) ("[T]o be an *inhabitant* within the meaning of this section of the Constitution, if it does not mean *resident* or *citizen*, certainly means more than *sojourner*, which is all that can be claimed for Mr. Pigott."); [Case of] Bailey (1824), in M. Clarke & D. Hall, Cases of Contested Elections in Congress 411, 416 (1834) (The Committee on Elections, explaining the distinction between "citizen" and "inhabitant," stated: "the latter appellation ['inhabitant'] is derived from habitation and abode, and not from the political privileges persons are entitled to exercise. Jacob's law dictionary defines 'inhabitant' to be 'a dweller or householder in any place, as inhabitants of the ville are householders in the ville.' "). Similarly, typical service of process statutes permit process to be served "in the judicial district of which such person is an inhabitant *or* wherever he may be found." *See, e.g.,* 7 U.S.C. § 2115; 15 U.S.C. § 22; 42 U.S.C. § 5411(c). The disjunctive "or" strongly suggests that the word "inhabitant" does *not* mean "wherever a person may be found." Venue statutes (unlike the Constitution) typically use "inhabitant" as coextensive with "resident." *See* H.R.Rep. 308, 80th Cong., 1st Sess. A127, A131 (1948) (in the 1948 revision of the general and patent venue statutes, the "[w]ord 'reside' was substituted for 'whereof he is an inhabitant' for clarity inasmuch as 'inhabitant' and 'resident' are synonymous") (citations omitted). Although the word "resident" may have a somewhat broader scope, it is not broad enough to encompass one who, living abroad, does not intend even to pass a single night in this country. A number of statutes also refer to the number or density of "inhabitants" as a criterion for federal funding or a trigger for certain regulatory requirements, figures which are either explicitly or implicitly determined by reference to Census statistics. *See, e.g.,* 7 U.S.C. § 1926(a)(7); 12 U.S.C. § 51; 49 U.S.C.App. § 1607a(d). The Census Bureau interprets the word to refer to those who are "residents," those who "generally eat, sleep and work" at the place in question. The Bureau would not include a temporary foreign visitor. *See Borough of Bethel Park v. Stans,* 449 F.2d 575, 578 (3d Cir. 1971).

Third, we have examined case law. With the arguable exception of *United States v. Otherson,* 637 F.2d 1276 (9th Cir.1980), *cert. denied,* 454 U.S. 840, 102 S.Ct. 149, 70 L.Ed.2d 123 (1981), to which we shall turn in a moment, we could find no case support for applying the word "inhabitant" to a temporary foreign daytime visitor. We found one case, decided a few years after Congress wrote the statute, which supports the appellants. *See Bicycle Stepladder Co. v. Gordon,* 57 F. 529, 531 (C.C.A.N.D. Ill.1893) (a Kentucky resident, visiting the Chicago World's Fair, is not an "inhabitant" of Illinois within the meaning of the patent venue statute, for that word "comprehends locality of existence; the dwelling place where one maintains his fixed and legal means of settlement; not a casual and temporary abiding place.... A mere 'sojourner' is not an 'inhabitant.' ").

Fourth, we have examined the legislative history of the provision with care. We agree with the government that Congress intended the provision to have a broad scope. Congress initially wrote the provision as part of a broader civil rights statute in 1866. *See* Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866). The first part of that initial statute offered protection of the *civil* law to civil rights of all "citizens," *see id.* § 1; *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975) (42 U.S.C. § 1981, the present-day codification of part of § 1 of the Civil Rights Act of 1866 as amended, gives rise to a private cause of action for both legal and equitable relief); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238–39, 90 S.Ct. 400, 405–06, 24 L.Ed.2d 386 (1969) (42 U.S.C. § 1982, the present-day codification of another part of § 1 of the Civil Rights Act of 1866 as amended, also gives rise to a private cause of action for both legal and equitable relief); the second part offered

the protection of the *criminal* law to the civil rights of any "inhabitant of any State or Territory," *see id.* § 2. There are few references in the legislative history to the term "inhabitant" and its meaning in this initial provision. One Senator, criticizing an earlier version of the *first* part of the statute, which protected "inhabitants of any State or Territory" rather than merely "citizens," noted that "[i]f [a foreigner] comes from England or from any of the countries in the world *and settles* in the State of Illinois, that moment he becomes an inhabitant." Cong.Globe, 39th Cong., 1st Sess. 505 (1866) (remarks of Senator Johnson) (emphasis added). When the bill was in the House, a Representative stated that "the word 'inhabitant' is printed in the second section in mistake for 'citizen,'" Cong.Globe, 39th Cong, 1st Sess. 1292 (1866) (remarks of Representative Bingham); regardless, as passed by Congress and signed into law, the second section referred to "inhabitant[s]."

Congress later changed the word "citizens" in the first (the "civil law") part of the statute to the far broader word "person." *See* Act of May 31, 1870, ch. 114, § 16, 16 Stat. 140, 144 (1870). It did not change the word "inhabitant," however, in the second ("criminal law") part. It did reenact the second part, however, and it changed other words in that part to make clear that the statute protected the rights of "aliens." *See id.* § 17. Senator Stewart, the chief proponent of the bill, made clear that he particularly wished the law to protect aliens in California where Chinese citizens, brought to America to work on the railroads, suffered from discrimination. *See* Cong.Globe, 41st Cong., 2d Sess. 3658, 3703, 3807–08 (1870). He stated that the bill "extends the operation of the civil rights bill ... to all persons within the jurisdiction of the United States.... This simply extends to foreigners, not citizens, the protection of our laws where the State laws deny them the equal civil rights enumerated in the first section." *Id.* at 1536.

This history, however, while it supports the argument for a broad interpretation, does not show Congress intended the statute to protect temporary visitors. Senator

Stewart could achieve his objective of protecting Chinese aliens in California without also protecting, say, every foreign sailor leaving ship for a few hours shore leave. The bill about which Senator Stewart spoke contained both civil and criminal parts. Congress could rationally have wished to give "civil law" protection to the rights of every "person" (as the "civil law" part said) without extending the "criminal law's" scope to protect temporary visitors. We do not say that Congress did intend these results; perhaps the use of the word "inhabitant" instead of "person" was simply an accident. But we cannot say that the result is so "'absurd,'" *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) (quoting *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (citations omitted)), or would so "'thwart the obvious purpose of the statute,'" *id.* (quoting *Brown*, 380 U.S. at 571, 85 S.Ct. at 1166); *see, e.g., United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 545 F.2d 754, 756 (1st Cir.1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977), as to warrant twisting the meaning of the word "inhabitant," broadening its scope to include territory that both language and law would otherwise say it did not encompass. It is one thing, after all, to look at a general word—say, the word "animal"—in a statute, and then to refer to legislative history to *narrow* the statutory scope of the word to the set of instances needed to fulfill the statute's purpose (say, in appropriate instances, omitting insects or fish). *See In re Trans Alaska Pipeline Rate Cases*, 436 U.S. at 643, 98 S.Ct. at 2061 (courts interpreting a statute may have some "'scope for adopting a *restricted* rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute'") (quoting *Brown*, 380 U.S. at 571, 85 S.Ct. at 1166 (citations omitted)) (emphasis

added). It is quite another thing, virtually unprecedented in the law, to take that statutory word and *broaden* its scope, extending it (the word "animal," for example) to areas (say, trees or flowers) where rules of language normally forbid its application.

Fifth, we have examined the series of criminal code reform bills considered by Congress in the 1970's and early 1980's. From 1973 onwards, those bills contained provisions that would have recast 18 U.S.C. § 242 to protect "all persons." *See, e.g.*, S. 1630, 97th Cong., 1st Sess. §§ 1501, 1502 (1981); H.R. 6915, 96th Cong., 2d Sess. §§ 2101, 2102 (1980); S. 1437, 95th Cong., 1st Sess. §§ 1501, 1502 (1977); S. 1400, 93rd Cong., 1st Sess. §§ 1501, 1502 (1973). However, none of those bills were enacted into law.

Sixth, we have read with care the Ninth Circuit case that the government cites in its support, *United States v. Otherson.* In that case the circuit *said*, "the term 'inhabitant' as used in section 242 ... include[s] all persons, without exception, present within the jurisdiction of the United States." *Otherson*, 637 F.2d at 1285. But that is not what the circuit *held*. Rather, the victims in *Otherson* were illegal aliens, present in the United States, presumably intending to live for some time in this country. The *Otherson* court argued that such persons were "inhabitants," for to hold otherwise would (1) withdraw the statute's protection from a broad category of aliens of the sort the statute's authors meant to protect, and (2) require the prosecution to shoulder the difficult burden of proving the "intent" and "legal status" of an alien victim, who, perhaps, would be dead at the time of the investigation. Neither of these reasons apply to the temporary alien visitor who does not intend to stay for even one night, where the record clearly rebuts any suggestion, or presumption, that he intended to stay a longer time. We can understand how one might bring an "illegal alien," intending to stay in the country for some time, within the scope of the word "inhabitant." We can understand how one might "presume" that an alien victim found in the United States intended to stay for some time. But we do not see how one

could extend that presumption to this case; and without it, we do not see how one can bring the victim here within the scope of the word. The facts here are not those of *Otherson*, and we do not believe that *Otherson* would require a different result.

Seventh, we have read the dissent with care, but it has not convinced us. The "synonym finder" that the dissent quotes simply says that sometimes the word "lives" is a synonym for the word "inhabits." It does not say one can use the latter word to describe the relation between a person and every country in which he spends a few hours, let alone any place in which, for however brief a time, he happens to be "[a]live."

The statement from Senator Trumbull that the dissent quotes reads, in context, as follows:

> I move that the Senate now proceed to the consideration of Senate bill No. 61, to protect all persons in the United States in their civil rights, and furnish the means of their vindication.

Cong.Globe, 39th Cong., 1st Sess. 211 (1866). Senator Trumbull, in making this statement, was simply reading the title of bill No. 61, which was *"An Act to protect all Persons in the United States in their Civil Rights, and furnish the Means of their Vindication."* Civil Rights Act of 1866, ch. 31, 14 Stat. 27, 27 (1866). The bill to which this title was attached did not do what the title said. It did not protect "all persons." Its text, as the dissent concedes, applied only to American *citizens.* Senator Trumbull's quote shows only that one cannot rely on titles fully to describe the law. The dissent also quotes Senator Stewart's statement that the 1870 amendment extends the operation of the civil rights law to "all persons within the jurisdiction of the United States." Senator Stewart, however, was describing the entire 1870 bill. Section 16 of that bill undeniably changes the scope of the "civil law" provision from "citizens" to "all persons." But, the problem is that the word "inhabitant" in the "criminal section" remained. We do not see how this statement can overcome that fact.

Nor can we agree with the dissent that, as a matter of logic, one must read the class of persons that 18 U.S.C. § 242 protects as coextensive with the class of persons that 42 U.S.C. § 1981 protects. It is true that these provisions were originally part of the same bill. It is equally true that former provision originally referred to the latter. But, there is an important difference between the two. The latter statute imposes criminal liability, while the former statute imposes civil liability. Logically speaking, one could intend to distinguish between the two in terms of their coverage. *Cf. Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 426, 88 S.Ct. 2186, 2195–96, 20 L.Ed.2d 1189 (1968) (finding that 18 U.S.C. § 242 and 42 U.S.C. § 1982 are, in a different respect, *not* coextensive).

Nor can Congress's undeniable intent to secure a broad reach for its civil rights statutes guarantee that each of those several different statutes protects all "persons." After all, different individual statutes use different words. Some use "persons," some use "inhabitants," some use "citizens." *See, e.g.*, 18 U.S.C. § 241 ("inhabitant"); 18 U.S.C. § 242 ("inhabitant"); 42 U.S.C. § 1981 ("persons"); 42 U.S.C. § 1982 ("citizens"). No court has held that the words "all citizens" mean "all persons," nor, with the exception of *Otherson*, has any court said that the word "inhabitants" means "persons." (As we have pointed out, we will accept *Otherson*, for the sake of argument, to the point where its presumption that an alien victim intended to stay in the United States at least overnight is, as here, conclusively refuted by the record.)

Ultimately, the dissent fails to convince us because we believe it casts the statute adrift from its linguistic moorings. And, this is not a technical point. Those moorings are important. After all, the most ancient, and perhaps the best, protection of human liberty lies in the requirement that governments cannot punish a person, however egregious his conduct, except according to the law. (Look, for example, at the 39th clause of the Magna Carta.) The law now before us, a criminal statute, refers to "inhabitant[s]." A foreign person who intends to visit the United States temporarily and only for a few hours does not inhabit the United States. The government may successfully prosecute the defendants for violating other statutes, such as those that forbid murder. It cannot punish the defendants for violating this one.

For these reasons, we conclude that the government cannot convict appellants of having violated 18 U.S.C. §. 242.

### III. *Other Claims*

Dominguez argues that the district court should have severed his trial from that of Maravilla. The basic claims against the two defendants, however, were the same. The evidence is basically the same. The jury could fairly easily have segregated the evidence related to the separate perjury and obstruction of justice counts that applied only to one or the other defendant, but not to both. The amount of potentially prejudicial evidence that applied only to one defendant (e.g., the prior smuggling conviction) was limited. The court clearly instructed the jury about its duty to keep the separate evidence separate in its mind. The court has broad leeway in deciding whether a joint trial is so prejudicial to one or the other defendant as to warrant (despite efficiencies) a severance. The district court decided not to sever the trials here; and we can find no abuse of its legal power. The law allows a trial court broad discretion in decisions to grant or deny motions to sever. *See, e.g., United States v. Lebron–Gonzalez*, 816 F.2d 823, 831 (1st Cir.1987) (in making a severance motion, "[a] defendant carries the heavy burden of making a strong showing of prejudice") (citation omitted), *cert. denied*, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); *United States v. Albert*, 773 F.2d 386, 388 (1st Cir.1985) (detailing standard for reversing conviction for denial of a severance motion).

Finally, appellants argue (and the government agrees) that the district court erred by providing that they would not become eligible for parole for 35 years. On resentencing, the district court will note

that under our decision in *United States v. Castonguay*, 843 F.2d 51 (1st Cir.1988) (interpreting 18 U.S.C. §§ 4205(a) and (b)), the maximum period of time a defendant can serve on any one count before being eligible for parole is one-third of the sentence but no more than ten years.

For these reasons, the judgment of the district court is

*Affirmed in part and reversed in part,* and the case is remanded to the district court for resentencing in accordance with this opinion.

BAILEY ALDRICH, Senior Circuit Judge, concurring.

I join fully in Chief Judge Breyer's opinion, and would add, perhaps too simplistically, that the habitation that I inhabit, like my good—and bad—habits, has a clear implication of continuum. I can not think that I am an inhabitant of every town, or state, that my bus passes through, any more than at the station when we stop for lunch.

TORRUELLA, Circuit Judge (concurring in part; dissenting in part).

I agree with the majority's opinion in all respects except as regards its interpretation of the coverage of 18 U.S.C. § 242. *See* Part II at pp. 223–28. Although I am not insensitive to the requirements of due process in giving criminal defendants fair notice of the standard of conduct to which they can be held accountable, *see United States v. Anzalone*, 766 F.2d 676 (1st Cir. 1985), the present situation, *i.e.*, the commission of robbery and murder by Customs agents, clearly does not fall short of that constitutional requirement as it can hardly be argued that appellants were unaware that such conduct would violate *some* federal criminal statute, or that *any* person in the United States would not be entitled to equal protection of its laws irrespective of their foreign status. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1885) (the guarantees of the Fourteenth Amendment extend to foreign citizens *temporarily* or permanently residing within the United States). *See Monroe v.*

*Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 481–82, 5 L.Ed.2d 492 (1961) (evolution of § 242 as result of passage of Fourteenth Amendment); *Screws v. United States*, 325 U.S. 91, 100, 65 S.Ct. 1031, 1034–35, 89 L.Ed. 1495 (1945) (in passing § 242 "Congress sought to enforce the Fourteenth Amendment").

The issue, however, is whether appellants' conduct violates *this* particular criminal statute. Contrary to my colleagues, I believe it does. It does so because such construction is required as a matter of plain meaning, because it makes common sense and is fair, because what skimpy legislative history there is, supports such a reading, and lastly, because there is precedential support for this conclusion.

As the majority correctly points out the term "inhabitant" can mean different things depending on the purpose of the statute in which the term is used, or the dictionary conveniently at hand. I, for example, have found that an "inhabitant" is one who "inhabit[s]," that is, one who "1. live[s], live[s] at, [or] abide[s]." Rodale, *The Synonym Finder*, Rodale Press (1978), p. 574. Independent of the source of our respective definitions, however, on two things my colleagues and I should be able to agree. First, Yamil Mitri–Lajam was "[a]live" within this territory before he had the misfortune of coming upon appellants, and secondly, he was very much a "[non-]inhabitant," under any definition, soon thereafter.

Another point of agreement, perhaps more fundamental in nature, should be the proposition, apparently accepted by the majority, *ante* at 225, that in enacting 18 U.S.C. § 242 Congress intended this provision to be interpreted broadly. This is in keeping with the spirit of civil rights legislation enacted at about the time § 242 was passed. *Cf. Ngiraingas v. Sánchez*, —— U.S. ——, ——, 110 S.Ct. 1737, 1746, 109 L.Ed.2d 163 (1990) (Brennan, J., dissenting) ("The Civil Rights Act was intended 'to protect and defend and give remedies for their wrongs to *all* the people' and thus to be 'liberally and beneficently construed' ") (emphasis in original). It should therefore

follow that the term "inhabitant" must be given its most ample meaning rather than the restricted denotation adopted by the majority. And it makes sense to do so, as the majority's interpretation " 'thwarts the obvious purpose of the statute.' " *See In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978). The scant legislative history of § 242 also supports my view, at least to the same extent as the majority's, for like a smorgasbord, legislative history has something for everyone.

Section 242 was originally enacted as Section 2 of the Civil Rights Act of 1866. Act of April 9, 1866, Ch. 31, 14 Stat. 27, quoted in *Screws v. United States*, 325 U.S. 91, 98, 65 S.Ct. 1031, 1033–34, 89 L.Ed. 1495 (1945). Section 2 criminalized the deprivation of certain substantive rights by a person acting under color of law, while Section 1, enacted at the same time, defined the rights entitled to protection. As stated at the time by Senator Trumbull, Chairman of the Senate Judiciary Committee which reported the bills, the purpose of Section 2 was "to protect *all persons in the United States* in their civil rights and furnish the means of their vindication." Cong.Globe, 39th Cong., 1st Sess., 211 (1866) (emphasis added), quoted in *Screws v. United States*, 325 U.S. at 98, 65 S.Ct. at 1033–34.[1]

In 1870, Sections 1 and 2 were reenacted and amended as Sections 16 and 17. *See Screws v. United States*, 325 U.S. at 99, 65 S.Ct. at 1034. Act of May 31, 1870, Ch. 114, 16 Stat. 140. Section 16, like Section 1, still contained a grant of substantive rights, but was changed to provide those rights to "all persons within the jurisdiction of the United States" rather than merely to those "persons born in the United States." See note 2, *supra*. While Section 17, the enforcement provision, still retained the term "inhabitant," the legislative history reflects that the statute was amended to ensure that the protection of Section 17 applied to all persons within the jurisdiction of the United States.

Senator Stewart, the chief proponent of the amendment, explained the scope of the new Act, stating:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that *all persons who are in the United States* shall have the equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to *all persons within the jurisdiction of the United States.* That is all there is in the bill.

> \* \* \* \* \* \*

> The civil rights bill had several other things applying to citizens of the United States. This simply extends to foreigners, not citizens, the protection of our laws.

Cong.Globe, 41st Cong., 2d Sess. 1536 (1870) (emphasis added). *See Screws v. United States*, 325 U.S. at 99, 99 n. 7, 65 S.Ct. at 1034, 1034 n. 7. Moreover, when explaining that the new law extended protection to aliens within the country, Senator Stewart made it clear that the Act covered all those physically present in the United States. *See* Cong.Globe, 41st Cong., 2d Sess. 3658 (1870), quoted in *Otherson, supra*, at 1284 (emphasis provided)

---

1. Both Sections 1 and 2, as originally introduced in Congress, referred to "inhabitants" of the United States. Section 1 gave "the 'inhabitant' of every race and color ... the right in every State or Territory in the United States ... to full and equal benefit of all laws," while Section 2 made it a misdemeanor to "subject [ ] any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act." Section 1's reference to "inhabitant" was changed in the House of Representatives to refer only to "citizens" or "persons born in the United States" because of concern that Congress only had authority over citizens. *See United*

*States v. Otherson*, 637 F.2d 1276, 1281 (9th Cir.1980), *cert. denied*, 454 U.S. 840, 102 S.Ct. 149, 70 L.Ed.2d 123 (1981) (citing Cong.Globe, 39th Cong., 1st Sess. 1115 (1866) (remarks of Representative Wilson)). Despite the fact that the coverage of Sections 1 and 2 was to be coextensive, the reference to "inhabitant" inadvertently remained in Section 2. *See* Cong. Globe, 39th Cong., 1st Sess. 1292 (1866) ("Mr. Speaker the word 'inhabitant' is printed in the second section in mistake for 'citizen'. I say this upon the suggestion of the chairman of the committee"). *See also Otherson, supra*, at 1281–82.

("aliens, *who may come here*, are entitled to that [equal] protection"). *See also* Cong.Globe, 41st Cong., 2d Sess. 1536 (1870), quoted in *Otherson, supra*, at 1284 (emphasis added) (bill protects "all persons who are *in* the United States," and "all persons *within the jurisdiction* of the United States"). *See United States v. Classic*, 313 U.S. 299, 327–28 n. 10, 61 S.Ct. 1031, 1043–44 n. 10, 85 L.Ed. 1368 (1941).

Since Section 17 refers to Section 16 to define the protected rights, the two sections must be read as coextensive.[2] *Cf. Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (comparing and harmonizing Section 1 of the 1866 Act with Section 2 when interpreting the statute). To construe the enforcement provision more narrowly than the substantive provision would be ascribing to Congress an intent to give all persons in the United States certain rights, while providing protection for those rights to only certain persons. *See Screws v. United States*, 325 U.S. at 100, 65 S.Ct. at 1034–35. As the Ninth Circuit in *Otherson* explained (637 F.2d at 1282):

> Since the 1866 Act had used 'inhabitant' to denote citizens—those on whom it conferred substantive rights—while the 1870 Act confers those rights on a much broader class, one can infer that 'inhabitant' in the 1870 Act refers to that expanded class: all persons present within the jurisdiction of the United States. Otherwise, section 17 would protect only a subclass of those to whom section 16 granted substantive rights—an anomaly contrary to the rule that provisions of a single act should be construed in as harmonious a fashion as possible. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973).

Lastly, we come to the precedential support in interpreting this provision, the Ninth Circuit's decision in *United States v. Otherson, supra*, a case which my brethren claim did not hold what in fact it *did*

hold, and which they distinguish from the present situation on the basis that the victims in that case "were illegal aliens, present in the United States, *presumably* intending to live for some time in this country*" [and thus less qualified within the restricted definition of "inhabitant" proposed]. *Ante* at 227 (emphasis supplied). After reading *Otherson* it may be possible to disagree with its conclusions, but certainly it cannot be distinguished on the grounds claimed by the majority. A brief summary of the facts would seem to suffice to establish the majority's misreading of the holding in *Otherson*.

On July 3, 1979 in the morning, a Border Patrol aircraft with Otherson aboard spotted aliens illegally crossing the border from Mexico. One of the aliens directed an obscene gesture at the aircraft. Shortly thereafter he was taken into custody whereupon Otherson and other members of the Border Patrol proceeded to assault him and several other aliens. This was repeated the next day while they were still in custody waiting "for routine deportation." *Otherson*, 637 F.2d at 1277. The Court of Appeals specifically concluded that:

> There was no evidence as to the identities, origins or destinations of any of the victims, nor as to the reasons for their presence in the United States.

*Id.* Defendants challenged the application of § 242 to this situation claiming that the aliens were not "inhabitants" within the reading of that section. After an exhaustive discussion of the legislative history of § 242, much of it covered herein, the court unequivocally rejected this contention and ruled that:

> [T]he term "inhabitant" as used in section 242 does include all persons, *without exception, present within the jurisdiction of the United States*.

*Id.* at 1285 (emphasis added).

From the above, it is clear that the alien victims in that case could not have quali-

---

**2.** Section 17 in pertinent part provides:
That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any

inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act * * * shall be deemed guilty.

fied within any of the *potpourri* of definitions of "inhabitant" provided by the majority, *ante* at 224–25, unless it can be said that they were "residents" or "dwellers" of the holding pen in which they were provisionally kept pending their "routine deportation." Such a distinction from the present case would be, to say the least, somewhat artificial. Thus, in my opinion, *Otherson* holds squarely against the majority's interpretation of § 242, and I believe, correctly so.

The Ninth Circuit's convictions in *Otherson* do not stand alone. The Fifth Circuit in *United States v. Dávila,* 704 F.2d 749 (5th Cir.1983), without comment approved a conviction under this statute in a case involving the sexual abuse of illegal aliens shortly after they crossed the border from Mexico.

The Magna Carta notwithstanding, there is no unfairness or lack of due process to appellants by the adoption of my proposed interpretation to § 242. In this respect I would like to again draw from an earlier challenge to this provision in which it was stated:

> [Defendants] were not puzzled to know for what they were indicted ... They simply misconceived that the victim had no federal rights and that what they had done was not a crime within the federal power to penalize. That kind of error relieves no one from penalty.

*Screws v. United States,* 325 U.S. at 128, 65 S.Ct. at 1049 (Rutledge, J., concurring) (footnote omitted).

In my opinion the majority's interpretation of § 242 does violence to a longstanding scheme established to lend support to the rights guaranteed by the Fourteenth Amendment. This scheme requires interpretation of the supportive legislation in a manner coextensive with that Amendment. *See Yick Wo v. Hopkins, supra.* This was clearly the intention of the Court when it said in 1945 with regard to § 242 and the Fourteenth Amendment:

> We hesitate to say that when Congress sought to enforce the Fourteenth Amendment in this fashion it did a vain thing. We hesitate to conclude that for 80 years this effort of Congress, renewed several times, to protect the important rights of the individual guaranteed by the Fourteenth Amendment has been an idle gesture.

*Screws v. United States,* 325 U.S. at 100, 65 S.Ct. at 1035 (footnote omitted). I know of nothing that has taken place in the 45 years since this statement to weaken the vitality of this proposition.

Lastly, I believe that the arguments proposed by the majority regarding the temporary nature of the victim's presence in Puerto Rico, rather than supporting their interpretation of § 242, pinpoint a major flaw in their position. Brother Breyer's proposal could allow the civil rights of an intransit passenger in the San Juan airport to be violated with impunity under § 242, while granting its full protection to the overnight sojourner at the airport hotel who got off the same flight to await a connecting flight next morning to Timbuktu. In Brother Aldrich's bus, some of the passengers stopping for lunch could be subjected to abuse by local authorities, immunized from the scope of § 242 by the majority's interpretation, while others, who sat at the same lunch counter, would be protected from the nefarious actions of these officials. Can such incongruous results be part of Congress' intended "broad interpretation" in enacting § 242? I think not.

For the reasons stated above, I believe that the majority's conclusions regarding § 242 are erroneous, and therefore I dissent from Part II of the court's decision.