UNITED STATES of America,
Plaintiff-Appellee,

v.

Jacob CARTLIDGE, Jr.,
Defendant-Appellant.

No. 86–4373.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1987.

* Chief Judge Clark has recused himself pursuant to 28 U.S.C. § 46(d).

We hold that—when the actions that would have constituted the crime of aiding and abetting consist of silence and providing warnings when needed—promises of such assistance, assurances of ability to provide protection against law enforcement interference, and supplying information about a convenient time for the operation, coupled with the acceptance of payment for these services, supplied sufficient evidence to show more than mere preparation and to prove an attempt to aid and abet in a federal crime. Turning to other issues, we hold that the district court did not commit plain error, if indeed it erred at all, in failing to exclude testimony given by a government witness in response to questioning by defense counsel and affirm the district court's decision that the prosecutor's exercise of peremptory challenges was not racially discriminatory in violation of the rule of *Batson v. Kentucky* [1] even if that rule applies to a case tried before *Batson*.

J. Rabun Jones, Howard Dyer, III (Court-appointed), Greenville, Miss., for defendant-appellant.

Richard T. Starrett, Asst. U.S. Atty., George Phillips, U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before GOLDBERG, RUBIN, and POLITZ, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The defendant, a former state law-enforcement officer, contends that evidence introduced to establish that he took a bribe to provide protection for a purported marijuana smuggling operation was not enough to show that he had attempted to aid and abet in the possession and distribution of marijuana, as charged in the federal indictment on which the jury found him guilty.

I.

Jacob Cartlidge was Chief Deputy Sheriff of Sharkey County, Mississippi. Because the sheriff of this rural county, Joe E. Ford, was a farmer as well as a police officer, he left the active management of the sheriff's office to Cartlidge, who supervised the four other deputies employed in the office. Construed most favorably to the government, as it must now be,[2] the evidence showed that the present episode began when Neal Wade, who lived in Rolling Fork, Mississippi, a town of 2,590 population, approached Bill Marshall, a Mississippi Bureau of Narcotics agent, who knew Wade to have been a user of controlled substances. Wade told Marshall that Cartlidge had solicited money from him in return for providing protection for drug deals. Marshall was incredulous but agreed to secrete a transmitter and tape recorder on Wade's person and to monitor a meeting between Wade and Cartlidge.

---

1. 476 U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Marshall monitored the meeting together with another state agent and Rolling Fork Chief of Police Charles McPhail. Via the transmitter, they heard Cartlidge demand $500 a month to provide protection for Wade's involvement in what Cartlidge assumed to be a drug operation. Two days later Marshall again met with Wade, again concealed a transmitter and tape recorder on Wade, and provided him with $250 in state funds. Wade then met with Cartlidge and paid him the $250, promising the balance at a future date. After this meeting, Marshall played the recordings of the two meetings to Sheriff Ford in confidence.

A few days later, Marshall and another Mississippi agent met with agents of the Drug Enforcement Administration, Sheriff Ford, and others to discuss a plan. Undercover law enforcement agents would be introduced to Cartlidge by Wade as drug smugglers from Louisiana. Wade would pay Cartlidge an additional $250 with state funds provided by Marshall, and the conversation would once again be recorded and transmitted by concealed instruments. Cartlidge met Wade at Wade's place of business in Rolling Fork. The two rode in Cartlidge's deputy sheriff's car to a cemetery outside Rolling Fork where they met the two undercover agents. One of the agents told Cartlidge that he proposed to have planes fly thousand-pound loads of marijuana to Sharkey County and would pay Cartlidge $1,000 per load initially, and more later, to provide protection. He gave Cartlidge $500 cash, promising him $500 more when the first load landed. Cartlidge said that he could provide security and that the timing was right because the sheriff was going to be out of town within the next two or three days. He assured the undercover agents that federal agents could not investigate suspected drug dealers in Sharkey County without his knowledge.

Cartlidge testified that these activities were part of his own undercover investigation and efforts to arrest drug dealers. He had not, however, mentioned these activities to the sheriff or to any other employee of the sheriff and had no notes of his investigation, although he stated, when first confronted, that he had made notes. He said he had put the first $250 paid him in a safe at his home to use as evidence but that he was unable to retrieve the money because his wife had found and spent it. His wife, who had been separated from Cartlidge at the time of his arrest but later had reconciled with him, testified at trial that she had taken the money two days before Cartlidge was arrested and had told him so the day after his arrest. She also testified that, although she knew the importance of accounting for the money, she did not inform any law-enforcement agent that she had taken the money until she appeared at trial. Cartlidge's first trial ended in a mistrial. On retrial he was convicted.

## II.

■ While there is no general federal statute making an attempt to commit a crime a separate criminal act, a federal statute imposes criminal punishment on "any person who attempts or conspires to commit any offense" proscribed by the Drug Control Act.[3] The statute, however, does not otherwise define what constitutes an attempt, and the legislative history offers no illumination.[4] Hence, in determining what acts—directed toward a criminal act but not accomplishing it—can be considered an attempt under this and other federal statutes relating to other specifically forbidden attempts, federal courts have, like state courts faced with a similar problem, followed the principles of attempt liability developed at common law.[5]

A recurrent problem in determining whether a defendant has committed an at-

---

3. 21 U.S.C. § 846 (1983).

4. *United States v. Mandujano,* 499 F.2d 370, 372 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

5. *See* LaFave and Scott, Criminal Law (1972) § 59, 425; Model Penal Code § 5.01, Comment (Tent. Draft No. 10, 1960).

tempt is "pinpointing the time in the unfolding of a criminal plan at which the actor becomes liable for an attempt."[6] The execution of a crime, other than one committed impetuously, involves planning and preparation. Like the jurisprudence of most states, federal law defines the threshold of criminality as the time when the defendant has gone beyond those preliminary activities and committed the additional act that constitutes the proscribed attempt even though he has not yet committed the contemplated crime.

In attempting to describe what constitutes an attempt, one jurisprudential theory requires evidence of an act that conforms to objective criteria defined in advance and determinable independently of the actor's intent. Professor George Fletcher labels this the "objectivist" view.[7] Others, adopting what Professor Fletcher calls the "subjectivist" view, do not essay specific criteria constituting attempts to commit various crimes but require instead that some act beyond preparation be done that is sufficient to verify the actor's commitment to carrying out his criminal plan.[8]

Most states have adopted the subjective-criminality approach.[9] Thus the Model Penal Code defines an attempt as "an act or omission constituting a substantial step in a course of conduct planned to culminate in ... commission of [a] crime."[10] The drafters of the Model Penal Code note that this approach emphasizes what the defendant has already done rather than what remains to be done, imposes liability only if some firmness of criminal purpose is shown, and permits the defendant's conduct to be assessed in the light of the statements.[11] It also recognizes that an attempt to aid in the commission of a crime is sufficient for criminal sanction,[12] and several state statutes explicitly condemn such conduct.[13]

The federal cases appear also to adopt a subjectivist approach.[14] After reviewing a number of federal decisions interpreting § 846 and other attempt statutes, a panel of this circuit in *United States v. Mundujano* provided a general definition of conduct that constitutes a criminal attempt:

First, the defendant must have acted with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.

Second, the defendant must have engaged in conduct which constitutes a substantial step toward the commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.[15]

Applying these criteria, the *Mandujano* court found the following evidence of attempt sufficient: the fact that an undercover agent gave a defendant $650 with which to buy the ounce of heroin as a sample for

---

**6.** G. Fletcher, Rethinking Criminal Law (1978) § 3.3.1, 135.

**7.** *Id.*, § 3.3.1, 138.

**8.** *Id.*

**9.** *See, e.g., Higgins v. State,* 41 Ala.App. 548, 142 So.2d 915, *cert. denied,* 273 Ala. 708, 142 So.2d 918 (1962); *State v. Mandel,* 78 Ariz. 226, 278 P.2d 413 (1954); *People v. Buffum,* 40 Cal.2d 709, 256 P.2d 317 (1953); *State v. Mazzada,* 141 Conn. 731, 109 A.2d 873 (1954); *Hollister v. State,* 156 Ind. 255, 59 N.E. 847 (1901); *State v. Bereman,* 177 Kan. 141, 276 P.2d 364 (1954); *State v. Sullivan,* 146 Me. 381, 82 A.2d 629 (1951); *State v. Thomas,* 438 S.W.2d 441 (Mo. 1969); *State v. Thompson,* 31 Nev. 207, 101 P. 557 (1909); *Martin v. Commonwealth,* 195 Va. 1107, 81 S.E:2d 574 (1954).

**10.** Model Penal Code, § 5.01(1)(c).

**11.** Model Penal Code § 5.01, Comment (Tent. Draft No. 10, 1960).

**12.** Model Penal Code § 2.06(3)(a)(ii).

**13.** *See, e.g.,* Hawaii Penal Code § 222(1)(b); 18 Pa.Cons.Stat.Ann. § 306(c)(1)(iii); Tex.Penal Code § 7.02(2).

**14.** *See, e.g., United States v. Noreikis,* 481 F.2d 1177 (7th Cir.1973) *vacated in part on diff. grnds., cert. denied in part,* 415 U.S. 904, 94 S.Ct. 1398, 39 L.Ed.2d 461 (1974); *United States v. Heng Awkak Roman,* 356 F.Supp. 434 (S.D.N.Y.), *aff'd,* 484 F.2d 1271 (2d Cir.1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974). *See also* S.Rep. No. 307, 97th Cong., 1st Sess. 163–64 (1981).

**15.** *Mandujano,* 499 F.2d at 376.

**1068**

the agent; the defendant's statement that he could get the drug from a "good contact"; and the defendant's "comments and conduct" before and after the payment. The court emphasized that the request for, and the receipt of, the money "constituted a substantial step toward the commission of the offense, distribution of heroin.... [P]roof that Mandujano's 'good contact' actually existed, and had heroin for sale, would have further strengthened the government's case; however, such proof was not essential."

On the other hand, another panel found insufficient evidence to constitute an attempt in *United States v. Oviedo.*[16] Oviedo sold a substance to an undercover agent, representing it to be heroin. In fact, it was procaine hydrochloride, an uncontrolled substance. Because Oviedo could not be prosecuted for distribution of heroin, the government charged him with an attempt. "We demand," the panel said, "that in order for a defendant to be guilty of a criminal attempt, the objective acts performed, without any reliance on the accompanying *mens rea,* make the defendant's conduct as criminal in nature. The acts should be unique rather than so commonplace that they are engaged in by persons not in violation of the law."[17] Because what Oviedo had sold was not heroin, his conduct was "ambivalent." The opinion distinguished *Mandujano* because that defendant had made a firm statement of future intention and there were no objective facts to the contrary. The *Oviedo* court could not infer, however, that Oviedo "intended to do that which he said he was going to do, because he in fact did something else."[18] The *Mandujano* test, as explained in *Oviedo,* remains this circuit's test, for we again applied it in *United States v. Woolery,*[19] finding the evidence sufficient.

**16.** 525 F.2d 881 (5th Cir.1976).

**17.** *Id.,* 525 F.2d at 885.

**18.** *Id.,* 525 F.2d at 886.

**19.** 735 F.2d 818, 822–23 (5th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1172, 84 L.Ed.2d 322 (1985); *see also United States v. Briscoe,* 742

The Second Circuit has adopted a similar analysis. In *United States v. Mowad,* citing *Mandujano,* the court applied a two-tier test: whether sufficient proof exists to establish that the accused possessed the requisite criminal intent and whether his conduct may be viewed as sufficiently corroborative of his established criminal intent.[20]

Cartlidge attacks the sufficiency of the evidence to show both his intent and the requisite substantial step. The evidence—which includes the testimony of the informant, the tapes of his conversations, and the discrepancy between his behavior and his purported investigatory purpose—was contradicted solely by his own testimony that he was ferreting out criminal activity. The jury chose not to believe him. Turning to the conduct involved, Cartlidge suggests that the federal officers should have waited to spring their trap on him until the plane had arrived. There was, of course, to be no plane. If the undercover agents had in fact been drug dealers and had flown a plane to Sharkey County, these would have been activities by them, not Cartlidge. Cartlidge's role in the plan was therefore virtually complete.

Cartlidge contends that the evidence against him, even if wholly believed, was sufficient only to prove that he took a bribe, not that he attempted to aid and abet in the distribution of marijuana. Cartlidge's acceptance of three payments was evidence of receipt of a bribe, but it was also a step in a plan to aid in the distribution of a controlled substance. Cartlidge also gave information about the propitiousness of the planned date, furnished information, albeit erroneous, that federal agents could not conduct an investigation without his knowledge, and promised to

F.2d 842, 846 (5th Cir.1984); *United States v. Brown,* 604 F.2d 347, 350 (5th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980).

**20.** 641 F.2d 1067, 1073 (2d Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981).

shield those whom he thought to be drug dealers. These activities are sufficient to show that he had moved beyond preparation. They were substantial steps strongly corroborative of criminal intent.

"It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." [21] The evidence is sufficient to meet that test.

### III.

#### A.

State police officer Bill Marshall testified as a witness for the prosecution. On cross examination, defense counsel asked about his testimony that he had played tape recordings of Cartlidge's conversations for Sheriff Ford:

Q. What if anything did the Sheriff say about his ability to hear and understand what was said on the tapes?

A. They weren't—The volume wasn't that good, but he could plainly hear Jacob Cartlidge and Neal Wade talking and that—and Jacob Cartlidge soliciting money from Neal Wade. He said that he thought—You know, he said, "I can't believe that, you know, he's guilty," you know, whatever.

■ Cartlidge did not object to this testimony but now contends that the district court's failure to give a cautionary instruction was plain error because the answer was unresponsive, and the testimony constituted not only hearsay but an opinion that the defendant was guilty.

The premises of the argument are questionable. The answer was responsive to that part of the question that inquired what the Sheriff said about whether he could understand what had been said on the tapes. Whether the testimony is an expression of opinion that Cartlidge was guilty or a profession of faith in his innocence depends on the tones the witness used, for the testimony can be read two ways. It may mean either (1) "I can't believe that he's guilty," reading the words "you know" as a mere interpolation, i.e., "I can't believe that he's guilty, you know" or (2) I can't believe that! You know, he's guilty.

The prosecutor did not emphasize the statement or argue to the jury that the sheriff (who testified as a witness for the defense) believed Cartlidge to be guilty. Even if the meaning conveyed to the jury was an interpretation that the tapes indicated guilt, we do not find the court's failure to act sua sponte to be error so plain as to require reversal.[22]

#### B.

State agent Steve Campbell, also a prosecution witness, was cross examined by defense counsel. The colloquy included this:

Q. Yes, sir. In the investigation that you've desecribed or that has been put forth here that Mr. Cartlidge was involved in, I believe you would agree that his procedures were improper; but at the same time could you emphatically say that Mr. Cartlidge was not trying to catch Neal Wade?

A. I don't see how he could be trying to catch Neal Wade or anybody like that.

Q. Why would you say that?

A. My opinion—and that's what you're asking—

Q. Yes.

A. —is that the way he was performing, he was taking money for payoff

**21.** *United States v. Bell,* 678 F.2d 547 (5th Cir. 1982) (en banc).

**22.** Fed.R.Crim.P. 52(b). *Kotteakos v. United States,* 328 U.S. 750, 757–66, 66 S.Ct. 1239, 1244–49, 90 L.Ed.2d 1557 (1946). *See also United*

*States v. Larson,* 722 F.2d 139 (5th Cir.1983), cert. denied, 466 U.S. 907, 104 S.Ct. 1688, 80 L.Ed.2d 161 (1984); *United States v. Gerald,* 624 F.2d 1291 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

to let a load of dope come in. There's not doubt in my mind.

Cartlidge contends that, while the first part of the answer was responsive, the latter portion was not, and that, despite his failure to object or seek a cautionary instruction, the trial court should have acted sua sponte and that its failure to do so was also plain error.

■ The brief statement by Campbell was not thereafter mentioned by the government. We cannot find that it substantially prejudiced the defendant or that it was the duty of the district court to monitor every answer to every question on cross examination. Indeed, had the court done so, without knowing the purpose or direction of cross examination, it might have been unduly intrusive.

## IV.

■ We assume without deciding that the decision in *Batson v. Kentucky* [23] concerning racial discrimination in the prosecutor's exercise of peremptory challenges applies to this case, tried just before *Batson* was decided, and that its application is not foreclosed by the failure of the defendant to object to the challenges during the trial. After the guilty verdict had been announced, the defendant filed a motion for a new trial contending that the prosecutor's challenges of four black jurors and one black alternate, resulting in a trial jury composed of eleven white and one black person, evidenced racial discrimination. The district court then considered an affidavit by the prosecutor without objection by the defendant, who tendered no other evidence. Based on the prosecutor's explanation of his reason for challenging each juror, the district court found that the prosecution had "adequately explained the basis for the exercise of its challenges" and had "met its burden" by articulating "legitimate non-discriminatory reasons for its exercise of its peremptory challenges." The affidavit, excerpts of which are appended

to this opinion, supports that conclusion. Thus although Cartlidge succeeded in making out a *prima facie* case of purposeful discrimination, the prosecutor successfully rebutted the discriminatory inference by proving that the challenges were based on articulable and specific racially neutral criteria.[24] We, therefore, agree with the district court that Cartlidge has failed to meet his burden of proof in showing discriminatory use of peremptory challenges by the government.

For these reasons, the judgment is AFFIRMED.

## APPENDIX

Excerpts from affidavit of Richard T. Starrett, Assistant United States Attorney.

\* \* \* \* \* \*

9. After voir dire of the jury venire, pursuant to the Court's procedure for selecting juries, counsel for the Government submitted a list of 12 jurors taken in order from the jury list which were acceptable to the Government. In selecting the first 12 acceptable jurors, I exercised 4 peremptory challenges on behalf of the Government. The jurors I struck and the reasons therefore are as follows:

a. Regina H. King (juror no. 5 on the jury list) was excluded because it was developed during voir dire by the trial judge that she knew Defendant's counsel and he apparently had done work for an agency she was associated with.

b. Eugene Dixon Wells (juror no. 8 on the jury list) was excluded because he was young, single and unemployed. These factors, with no reference to race, were considered by the prosecutor *in the particular case* to result in a juror unduly predisposed against the prosecution of an individual as to whom the evidence would disclose the existence of a severe financial condition, a separation from his wife and a conspiracy to import, possess and distribute marijuana.

---

**23.** 476 U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**24.** *See Batson,* 106 S.Ct. at 1723–24 & n. 20.

c. Clevisteen Grant (juror no. 14 on the jury list) was excluded because unlike the other jurors selected by the Government, she avoided eye contact with the prosecutor. As a personal preference, eye contact is highly valued as a jury selection technique. Additionally, and equally importantly, 2 of the next 3 jurors were particularly desireable [sic] from the Government's viewpoint: Rachel H. Bullman (juror no. 15 on the jury list—ultimately struck with the Defendant's 5th peremptory challenge), a church secretary, and Myrtle M. Addison (juror no. 17 on the jury list), a black Equal Employment Opportunity Commission Compliance Officer....

d. Ezzard Charles Artis (juror no. 16 on the jury panel) was excluded because his brother had been convicted of robbery. The Government considered him a risk to be unduly disposed against the prosecution in this case.

10. Despite having 2 peremptory challenges left, I included a black juror on the panel I tendered to the Defendant (Myrtle M. Addison-juror No. 17 on the jury list and juror no. 7 of the petit panel).

11. In exercising 7 of his allotted 10 peremptory challenges, ... the Defendant tendered a complete panel of 12 jurors to me which I accepted without using any additional challenges.

12. Pursuant to the Court's procedure for selecting an alternate juror, counsel were instructed that they had one peremptory challenge each to select an alternate juror.

13. I tendered the next-in-line juror as a suitable alternate.

14. The Defendant exercised his challenge and tendered back the next-in-line juror.

15. I exercised my unexpended alternate juror challenge to strike Fannie Mae Rhymes Courtney, and I tendered the next-in-line juror, Kitty S. Kelly.

16. My reasons for striking juror Courtney were as follows: Fannie Mae Rhymes Courtney (juror no. 27 on the jury list) was struck by use of the Government's one alternate juror challenge because she was divorced and appeared to have a low income occupation. Additionally, striking this juror gave the Government Kitty S. Kelly (juror no. 28 on the jury list), a professional married woman, thought to be less opposed to the prosecution than alternate Courtney.