**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juan Antonio CONTRERAS,**
**Defendant–Appellant.**

**No. 91–2021.**

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1991.

Gregory K. Zaney, Austin, Tex., for defendant-appellant.

Lisa J. Stark, Dennis J. Dimsey, U.S. Dept. of Justice, Appellate Sec., Washington, D.C., Paula Offenhauser, Asst. U.S. Atty., Ronald G. Woods, U.S. Atty., Houston, Tex., John David Lenoir, Asst. U.S. Atty., Southern District of Texas, Peter W. McCloskey, Trial Atty., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GOLDBERG, SMITH, and DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Juan Antonio Contreras contends that there is insufficient evidence to sustain his conviction for conspiring and attempting to kill Patricia Orozco in order to prevent her from testifying against him. He also challenges the sufficiency of the evidence with regard to his use of a weapon during and in relation to two crimes of violence and argues that the district court committed plain error when it instructed the jury as to attempt. Finally, he contends that Orozco was not an "inhabitant" of the United States within the meaning of the applicable civil rights statute and that therefore his conviction for violating her civil rights should be reversed. Finding no error, we affirm.

I.

At about 11:00 p.m. on January 10, 1990, Contreras, an on-duty police officer in Laredo, Texas, stopped a car containing Or-

ozco and Librado Galvan.[1] After questioning Galvan briefly, Contreras asked Orozco for identification demonstrating her citizenship, which she could not provide. Contreras told Galvan that he could leave, then directed Orozco into the back of his police cruiser for the purpose of transporting her to the Immigration and Naturalization Service.

Instead, Contreras drove to a dark, isolated area on the edge of the Laredo Junior College campus, stopped the car, and told Orozco to get out and take off her clothes. When she refused, he forcefully unbuttoned her blouse and grabbed her upper body. Although Contreras put his gunbelt on the roof of the car at that point, Orozco testified that she "had to obey him because of fear" and that she thought he "would kill [her] or hit [her]" if she attempted to run away. Contreras ordered Orozco to take off her pants and lay down on the back seat. Then, with his gun in reach, he sexually assaulted her.[2]

Afterwards, Contreras drove Orozco back to the area where he had initially stopped the car. Orozco immediately reported the incident to the police, telling officers that she had been sexually assaulted by a uniformed police officer who carried a weapon.

On January 16, 1990, a Webb County grand jury returned an indictment charging Contreras with aggravated kidnapping and aggravated sexual assault of Orozco, with trial set for May 14. On the afternoon of May 2, Contreras met with a friend, Gerardo Valdez. Contreras told Valdez that he needed to prevent Orozco from testifying against him at trial, and Valdez agreed to help Contreras find and kill her.

Contreras and Valdez looked for Orozco in Nuevo Laredo, Mexico, that day, but did not locate her. Valdez suggested to Contreras that his former co-worker, David Koenig, could help them find Orozco. On May 4, Valdez telephoned Koenig and set up a May 5 meeting among Koenig, Valdez, and Contreras.

When the three met on May 5, Valdez and Contreras told Koenig that they wanted to kill Orozco to prevent her from testifying and asked Koenig to show them Orozco's home. During the meeting, Contreras held up his pistol and said, "I'll talk to her with this." [3]

Valdez returned to see Koenig the next day, May 6, stressing that he and Contreras wanted Koenig to lead them to Orozco's residence. Koenig agreed to meet them later that day. When he arrived at the appointed meeting place, Valdez and Contreras had not arrived yet. Koenig then left the meeting place for a few moments to search for his boss, whom he found. Koenig told his boss about the discussions with Valdez and Contreras, and then asked him to convey the information to the police. Koenig's boss then called the FBI, which planned to witness the meeting among Koenig, Valdez, and Contreras.

Later that day, the three reconvened and, riding in Valdez's truck and following Koenig's directions, located Orozco's supposed residence in Nuevo Laredo, Mexico. After Koenig pointed out the house, Contreras commented, "That's it. I saw it. I saw the sign, familia [O]rozco." When Koenig asked how the other two would carry out their plan, Contreras responded that he would "come back in civilian clothes in a new vehicle, go up to her house, knock on the door, and just shoot her."

---

1. We view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict. *United States v. Lemons,* 941 F.2d 309, 314 (5th Cir. 1991) (per curiam).

2. Contreras's version of the facts differs dramatically. He testified that Orozco offered to have sex with him, willingly removed her clothes, and participated in consensual intercourse.

3. The defendant conceded at trial that he and Valdez met with Koenig on May 5 with the purpose of finding Orozco, but testified that he wanted to find her because of the personal problems he had experienced because of her allegations. He denied putting a gun to his head; rather, he claimed that he put a finger to his head and said that he would like to "give her the same kind of headache she's been giving me."

Working with Koenig, the FBI obtained enough information to arrest Valdez three days later (May 9). FBI agents conducted the arrest at around 7:00 a.m. About an hour after his arrest, Valdez agreed to cooperate with the FBI.[4]

At the direction of the FBI, Valdez telephoned Contreras at around 5:00 p.m. that day. During that conversation, Contreras said "tonight, ... we can go ... and finish this once and for all."[5] Around 9:00 p.m., Valdez again called Contreras to see whether he was ready and to ask him whether he needed any bullets. Contreras said that he had bullets and asked Valdez to pick him up.

Valdez, who carried a hidden microphone, arrived to pick up Contreras soon thereafter. In Valdez's truck, Contreras asked Valdez whether he had a mask and gloves. Contreras then tested ("dry-fired") his gun. The FBI arrested Contreras at the border, about ten minutes from the Orozco home, and found bullets and a handgun in the truck.[6]

On May 31, 1990, a federal grand jury returned a six-count indictment against Contreras. Count one charged him with willfully depriving Orozco of her constitutional rights, while acting under color of law, by unlawfully detaining her, in violation of 18 U.S.C. § 242. Count two charged him with willfully depriving Orozco of her constitutional rights, while acting under color of law, by sexually assaulting her, in violation of section 242. Count three charged him with using and carrying a weapon during and in relation to a crime of violence (the sexual assault alleged in count two), in violation of 18 U.S.C. § 924(c)(1). Count four charged him with conspiracy to tamper with a witness by attempting to kill her, in violation of 18 U.S.C. §§ 371 and 1512. Count five charged him with tampering with a witness

by attempting to kill her in violation of section 1512(a)(1)(C). Count six charged him with using and carrying a weapon during and in relation to a crime of violence (witness tampering alleged in count five) in violation of section 924(c)(1). The jury returned a verdict of guilty on all six counts.

## II.

■ Contreras first argues that there is insufficient evidence to sustain his conviction on count five (tampering with a witness by attempting to kill her). When considering the sufficiency of the evidence, we view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict, and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Lemons,* 941 F.2d 309, 314 (5th Cir.1991) (per curiam).

Count five charged Contreras with violating 18 U.S.C. § 1512(a)(1)(C), which makes it illegal to "kill[ ] or attempt[ ] to kill another person, with intent to ... prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense...." Contreras argues that there is insufficient evidence to sustain his conviction because he "engaged in no conduct which constituted a substantial step toward commission of a crime." Instead, he argues, his actions amounted to no more than "mere preparation."

In *United States v. Mandujano,* 499 F.2d 370 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), we articulated a two-part test for determining whether a defendant engaged in a criminal attempt. "First, the defen-

---

**4.** Valdez agreed to obtain incriminating statements from Contreras. In exchange, the FBI promised to "bring it to the attention of the proper authorities and ... tell them that—the degree to which [Valdez] had helped us." Valdez later pleaded guilty to conspiring to kill Orozco. As part of the plea agreement, the government agreed not to charge Valdez with any other crimes arising out of the conspiracy.

**5.** The FBI taped this conversation.

**6.** Contreras testified that he and Valdez were going out to clubs in Nuevo Laredo and that he needed the gun for self-protection.

dant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting." *Id.* at 376. "Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime." *Id. See also United States v. Cartlidge,* 808 F.2d 1064, 1068 (5th Cir.1987) (*Mandujano*'s two-prong test "remains this circuit's test"). We have held that "[a] substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent." *Mandujano,* 499 F.2d at 376.

█ Our review of the record leads us to conclude that there was sufficient evidence demonstrating both Contreras's intent to carry out the plan to kill Orozco (satisfying *Mandujano*'s first requirement) and his commission of a substantial step toward that end (satisfying *Mandujano*'s second requirement). Contreras manifested his intent to kill Orozco in several ways. First, he solicited the help of both Valdez and Koenig by telling them that he wanted to kill Orozco to prevent her from testifying against him. Second, he announced his intent to return and shoot Orozco after identifying her home with Valdez and Koenig. Finally, he expressed his intent to "finish this once and for all" when conversing with Valdez on the phone the afternoon of May 9.

Contreras's activities constituted a substantial step toward the commission of the crime as well. First, he enlisted the help of Valdez to find and kill Orozco. Then he enlisted the help of Koenig to find her. Next, he searched for her and conducted surveillance of her home. He also obtained a gun and bullets. Finally, .he drove toward Orozco's home with the bullets and the just-tested gun. But for the FBI's intervention, Contreras might have succeeded in killing Orozco that night.

This is more than enough evidence to satisfy the two-pronged test. We agree with the government that "some combination of a defendant's enlisting the assistance of others, visiting or studying the scene of the contemplated crime, and col-lecting or testing materials to be used to commit the crime" is sufficient to support a jury's finding that the defendant was guilty of attempt. *See e.g., United States v. Briscoe,* 742 F.2d 842, 846 (5th Cir.1984) (evidence sufficient where defendant enlisted the aid of several people to assist in the crime; announced to another her intent to commit the crime; and tested the device she was to use to commit the crime); *United States v. Brown,* 604 F.2d 347, 350 (5th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980) (evidence sufficient where defendant agreed with another to obtain the necessary devices to commit the crime and sent others to inspect the scene where the crime was to take place).

Contreras responds with two arguments in support of his insufficiency of the evidence claim. First, he argues that he could not attempt to kill Orozco because he did not know where she lived and "the Government never offered any proof that she resided at the location in Mexico to which David Koenig took [him]." Second, he contends that his conviction should be reversed because the government (and presumably the district court) improperly relied upon an "objectivist" view of attempt.

█ Contreras's first argument is without merit. Even if Orozco did not live at the house in Nuevo Laredo, factual impossibility is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be. *United States v. Conway,* 507 F.2d 1047, 1050 (5th Cir.1975). The evidence in this case established that Contreras believed that Orozco lived at the house. Not only did Contreras comment on the Orozco nameplate he saw on the house, he said he would return to shoot Orozco. Thus, whether the residence *actually* belonged to the Orozco family is beside the point.

His second argument fails as well. It is true that we, along with most circuits, have adopted a "subjectivist" approach to attempt. *Cartlidge,* 808 F.2d at 1067. Contreras interprets "subjective" to mean that a court should look at the circum-

stances as *he* saw them. He places a great deal of emphasis on his version of the facts, noting that on the night of his arrest, it was Valdez who insisted that he go to Mexico with him in an effort to find evidence of Orozco's "bad moral character." Contreras adds that "there is nothing unique about a police officer, licensed to carry a firearm, arming himself with a gun, as he undertook his fact-finding venture to Mexico." [7]

This is tantamount to arguing that, because Contreras *thinks* he is innocent, he is innocent. This is an erroneous reading of our precedent. As we explained in *Cartlidge*, an "objectivist" theory of attempt "requires evidence of an act that conforms to objective criteria defined in advance and determinable independently of the actor's intent." *Id.* at 1067. We rejected this approach in *Cartlidge*. Instead, we reaffirmed *Mandujano*, noting that whereas criminal intent alone is not enough to commit an attempt, criminal intent coupled with "some act beyond preparation . . . that is sufficient to verify the actor's commitment to carrying out his criminal plan" is enough. *Id.* Those acts "should be unique rather than so commonplace that they are engaged in by persons not in violation of the law." *Id.* at 1068 (quoting *United States v. Oviedo*, 525 F.2d 881, 885 (5th Cir.1976)).

■ Contreras mistakenly takes this to mean that, because his conduct *could* have been innocent (or "commonplace"), it *was* innocent. We rejected an identical argument in *Cartlidge*, where a former state law enforcement officer was convicted of attempting to aid and abet the distribution of marihuana by taking a bribe. In that case we said,

> [The defendant] attacks the sufficiency of the evidence to show both his intent and the requisite substantial step. The evidence—which includes the testimony of the informant, the tapes of his conversations, and the discrepancy between his

behavior and his purported investigatory purpose—*was contradicted solely by his own testimony that he was ferreting out criminal activity. The jury chose not to believe him.*

*Id.* at 1068 (emphasis added). Similarly in this case, the jury chose not to believe Contreras; instead, it found that his acts were sufficiently unique and thus strongly corroborative of his criminal intent. Because we conclude that there was ample evidence from which the jury could have found guilt beyond a reasonable doubt, we affirm Contreras's conviction on count five.

### III.

■ Contreras next contends that the evidence is insufficient to sustain his conviction on count four (conspiring to tamper with a witness by attempting to kill her). Contreras challenges his conviction on the ground that "at the time of his arrest the alleged conspiracy involved only him." Again, we view the evidence in the light most favorable to the government.

Section 371 makes it unlawful for "two or more persons [to] conspire . . . to commit any offense against the United States"—in this case, attempting to kill Orozco in violation of section 1512(a)(1)(C). We have long held that "[a] conviction for conspiracy under 18 U.S.C. § 371 requires that the government prove beyond a reasonable doubt 1) an agreement between two or more persons, 2) to commit a crime against the United States, and 3) an overt act committed by one of the conspirators in furtherance of the agreement." *United States v. Schmick*, 904 F.2d 936, 941 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991) (citations omitted).

With regard to the required agreement, "the evidence must show beyond a reasonable doubt that two or more *non-governmental* persons agreed to commit the alleged offense." *United States v. Goff*, 847 F.2d 149, 173 (5th Cir.) (citation omitted)

---

**7.** On appeal, Contreras emphasizes this "fact-finding" aspect of his and Valdez's trip to Mexico on the evening of May 9. At trial, however, he emphasized that he and Valdez were on their way to nightclubs in Nuevo Laredo and that he brought his gun along because he "feared for [his] safety."

(emphasis added), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988). Indeed, "[a] government agent or informer cannot be a co-conspirator" because that person does not "share the unlawful objective of those engaged in the unlawful enterprise." *Id.* at 173 & n. 37. Contreras argues that when the evidence from the period before Valdez's arrest is considered in isolation, there is insufficient evidence to support the existence of a conspiracy.

There is ample evidence, however, to show that Contreras entered into an agreement with Valdez and committed overt acts in furtherance of the conspiracy while Valdez remained a nongovernmental person. At trial, the government conceded that the conspiracy ended on May 9. Events occurring before that date included the following: (1) On May 2, Valdez and Contreras entered into a plan to kill Orozco to prevent her from testifying against Contreras at trial; (2) on May 2, Valdez and Contreras searched for Orozco; (3) on May 5, Valdez and Contreras visited Koenig to obtain his assistance in finding Orozco; during the meeting, Contreras gestured with his gun, saying "I'll talk to her with this"; and (4) on May 6, Koenig, Valdez, and Contreras rode to Nuevo Laredo together, where Koenig pointed out Orozco's home.

Contreras's mistake is that he fails to make a distinction between what is required to prove conspiracy and what is required to prove the substantive offense (in this case, the attempt to kill Orozco in order to prevent her from testifying). Contreras repeats the arguments he made with regard to the attempt charge, contending that "[t]he evidence is insufficient to prove he attempted to kill Patricia Orozco pursuant to a plan or conspiracy" prior to Valdez's arrest. This is not the proper inquiry, however. The government did not need to show that Contreras *attempted* to kill Orozco prior to Valdez's arrest; rather, it had to show that he *conspired* to do so prior to the arrest.

Finally, Contreras again misconstrues the focus of our review. Essentially he argues that because he has provided innocent explanations for his conduct, the government's evidence is insufficient. He ignores the government's evidence of his conduct prior to May 9 (the date of Valdez's arrest), apparently because he feels he can provide innocent explanations for his conduct during that pre-arrest period. But we must view the evidence in the light most favorable to the government. Using this standard, we find sufficient evidence to support the conspiracy conviction contained in count four.

## IV.

■ Although Contreras did not object at trial to the jury instructions as to "attempt" in relation to counts four, five, and six, he now contends that those instructions constituted plain error. Federal Rule of Criminal Procedure 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." However, in order to justify an exception to the contemporaneous objection rule, such errors must be of a nature that they would result in a miscarriage of justice if not remedied. *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). We find that Contreras fails to show the kind of "particularly egregious errors" that warrant reversal. *Id.* at 15, 105 S.Ct. at 1046.

### A.

As to count five, the district court instructed the jury that "[t]o attempt an offense means to willfully do some act in an effort to bring about or accomplish something the law forbids." Contreras argues that the Fifth Circuit law of attempt demands an instruction that includes "substantial step" language along the lines of *Mandujano.* Without it, the defendant contends, the "some act" instruction seems both "inadequate" and "inaccurate" because it fails to distinguish "mere preparation" from a "substantial step."

■ In *United States v. Conway*, 507 F.2d 1047, 1052 (5th Cir.1975),[8] however, we held that the instructions given to the jury on attempt—instructions that were nearly identical[9] to the instructions given here—did not constitute plain error. Moreover, the Seventh Circuit recently held that a *Conway*-type instruction did not constitute plain error, stating that "[o]nly the Ninth Circuit has held squarely [in *United States v. Taylor*, 716 F.2d 701, 711–12 (9th Cir.1983)] that, at least when counsel makes timely objection, such [substantial step] terminology is essential." *United States v. Valencia*, 907 F.2d 671, 684 (7th Cir.1990).

As the Seventh Circuit noted, counsel objected to the instruction at trial in *Taylor*. By contrast, this is a plain error case. Thus, even if "substantial step" language were desirable as a general matter, its omission does not constitute plain error unless it could have meant the difference between acquittal and conviction. *Cf. United States v. August*, 835 F.2d 76, 79 (5th Cir.1987) (per curiam) (holding that an instruction cautioning the jury that "mere preparation" is not enough is unnecessary where "the line dividing simple contemplation ... from serious action directed to the criminal result is [not] a doubtful one"). This is not such a case. Indeed, the evidence that Contreras "had taken a substantial step strongly corroborative of his criminal intent was so strong that any error resulting from the district court's omission of the 'substantial step' language did not rise to the level of plain error." *Valencia*, 907 F.2d at 685.

■ Contreras also contends that the district court should have defined the term "willfully" in its attempt instruction. The district court did so in its instruction on count two. Once the court properly gave the instruction with regard to count two, it did not need to repeat that instruction on count five. *Estes v. United States*, 335 F.2d 609, 617 (5th Cir.1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965). *See also Valencia*, 907 F.2d at 683 (failure of district court to define "willfully" did not constitute plain error where other instructions adequately stated the required mental state).

**B.**

Contreras also challenges the district court's instruction as to count six. The district court did not give an attempt instruction under that count. Instead, it stated that "[t]he gun charge in this count is about the defendant's alleged attempt to kill Orozco charged in count five." The district court did, however, instruct the jury as to attempt under count five. It was unnecessary for the court to repeat this instruction, which, as noted above, withstands Contreras's plain error challenge.[10]

**C.**

■ Count four charged Contreras with conspiracy to tamper with a witness by attempting to kill her. Contreras argues that the district court's failure to include an attempt instruction constitutes plain error. Because the government was not required to prove the underlying offense in establishing the conspiracy, it was not necessary for the court to give an attempt instruction under count four. *See United States v. Romeros*, 600 F.2d 1104, 1105 (5th

---

**8.** *Conway* was issued after *Mandujano*.

**9.** In *Conway*, the district court had instructed the jury that "[t]o 'attempt' an offense means willfully to do some act, in an effort to bring about or accomplish something the law forbids to be done." 507 F.2d at 1052.

**10.** Contreras also challenges the district court's lack of instruction on count six regarding "[t]he relation between the firearm and the underlying offense." The court, however, did provide such an instruction. It informed the jury that

A person uses or carries a firearm in relation to a crime of violence when he has possession or control of a gun in a way that may have facilitated his commission of the crime. He does not have to have shown the gun or fired it. Even if he only had the opportunity or ability to show or fire the gun to help him with the crime, that is enough. If the defendant as a police officer otherwise legally carried a pistol, he still may not carry a firearm to commit a crime.

We find that this instruction did not constitute plain error.

Cir.1979) (per curiam), *cert. denied,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980) (conspiracy and the related substantive offense are distinct crimes). Moreover, as noted above, the jury received an instruction regarding attempt under count five; it was not necessary for the court to give duplicative instructions.

## V.

■ Contreras argues next that the evidence is insufficient to sustain his conviction under counts three and six, which charged him with using and carrying a firearm during and in relation to two crimes of violence (sexual assault charged in count two, and tampering with a witness charged in count five). Section 924(c)(1) enhances the sentence of a defendant who, "during and in relation to any crime of violence ... for which he may be prosecuted in a court of the United States, uses or carries a firearm." In *United States v. Robinson,* 857 F.2d 1006, 1010 (5th Cir. 1988) (citation omitted), we held that "[p]ossession of a firearm can constitute the requisite use [under § 924(c)(1) ], if the possession is 'an integral part of the felony.'" In *United States v. Coburn,* 876 F.2d 372, 375 (5th Cir.1989), we explained that "the government had to prove as an essential element of the offense that a relationship existed between" the firearm and the underlying offense.

The government does not have to show, however, that a defendant actually used or brandished the firearm to prove "use" within the meaning of section 924(c). *Id.* Seizing on legislative intent as a guide, the *Coburn* panel recognized that if the evidence shows that the "firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others," the

defendant "used" the firearm regardless of whether such display or discharge occurred. *Id.* (citation omitted). The fact that a weapon is "unloaded" or "inoperative" does not insulate the defendant from the reach of section 924(c)(1). *Id.*

## A.

First we consider the weapons conviction based upon the sexual assault. Contreras essentially puts forth two arguments to show that the government failed to demonstrate the requisite relationship between the weapon and the assault. First, he reiterates that he was required to carry a firearm as an on-duty police officer and adds that Orozco's own testimony shows that he "never took his gun out of his belt and threatened her." Second, he argues that the "emboldened requirement applies only if the gun was hidden" and that therefore there could be no "emboldening" in this case because the gun was not hidden.[11]

■ Both arguments are without merit. As to the first, Congress intended section 924(c) to apply to police officers who "abuse that privilege [of being licensed to carry a firearm] by committing a crime with the weapon." S.Rep. No. 225, 98th Cong., 2d Sess. 315 n. 10 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3492 n. 10. Contreras acknowledges that officers should not be allowed to commit crimes with impunity. He argues, however, that his case falls within the category of cases in which defendants inadvertently carry a weapon with them in an unrelated crime— cases that fall outside the reach of the statute. *See United States v. Wilson,* 884 F.2d 174, 177 (5th Cir.1989).[12]

The evidence is sufficient to show that this was not a case of mere inadvertence.

---

**11.** Contreras also makes an assertion that the sexual assault could not be a crime of violence, given that "Contreras and Orozco engaged in consensual sexual intercourse." Again, we are to consider the facts in the light most favorable to the government; we therefore view the intercourse as non-consensual.

**12.** *Wilson* specifically addressed a 1984 amendment to the statute that changed the offense from "us[ing] or carry[ing]" a firearm "during" the commission of a felony to "us[ing] or carry[ing]" one "during and in relation to" the commission of a felony. We noted that the "in relation to" language was calculated to avoid convictions for inadvertently carrying a firearm in an unrelated crime. *Wilson,* 884 F.2d at 177.

The jury reasonably could have concluded that Contreras was emboldened by his possession of a firearm to assault Orozco, that he displayed the gun in order to intimidate her, and that he had the opportunity and ability to discharge the gun during the entire incident. Orozco testified that the gun was within Contreras's reach during the entire incident and that she believed that he would "kill ... or hit" her if she tried to escape. The fact that Orozco admitted that the defendant did not actually threaten her with the weapon does not lead to the conclusion that the weapon did not embolden him to commit the assault in the first place.[13]

■ Finally, the notion that a gun must be hidden to "embolden" is not only counterintuitive, it is directly refuted by our caselaw. In *Coburn,* we held that "a shotgun displayed in the rear window of the pickup truck" emboldened the defendant to commit a crime. 876 F.2d at 375.[14] Because we find that there was sufficient evidence that the presence of the weapon emboldened Contreras, we affirm his conviction on count three.

### B.

■ Contreras also challenges the weapons conviction based upon his possession of a firearm at the time of his arrest. He does not dispute the fact that he possessed a gun when the FBI intercepted him; rather, he contends that he did not use the gun during and in relation to his attempt to kill Orozco because it failed to "embolden" him.

13. Her testimony on the issue was as follows:
Q: Did the gun scare you?
A: Yes, sir.
Q: What [did] you think might happen if you tried to run, then?
A: That he would kill me or hit me.
Q: Could have shot you too, couldn't he?
A: Yes, sir.
Q: He told you to get naked; is that right?
A: Yes, sir.
Q: But he never threatened that if you didn't get naked he would kill you?
A: No, sir.
Q: He merely had taken you to a dark place away from your friend, told you to get naked, and took his police belt off; is that correct?

This argument is wholly without merit. There was overwhelming evidence at trial that Contreras's pistol was the intended murder weapon and thus was "central to the accomplishment of the contemplated crime." *United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985). *See also Coburn,* 876 F.2d at 375 (citing *LaGuardia* ). We therefore affirm Contreras's conviction on count six.

### VI.

■ Section 242 makes it unlawful for anyone acting under color of law

willfully [to] subject[ ] *any inhabitant* of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments ... *on account of such inhabitant being an alien....*

18 U.S.C. § 242 (emphasis added). Contreras argues that the government failed to meet its burden of showing that Orozco was an inhabitant and that therefore his convictions under counts one and two (depriving Orozco of her civil rights, while acting under color of law, by unlawfully detaining and assaulting her) must be reversed. He also argues that we should give the word "inhabitant" a narrow construction in accordance with the rule of lenity.

### A.

Contreras cites *United States v. Maravilla,* 907 F.2d 216 (1st Cir.1990), to support his argument that Orozco was not an

A: Yes, sir.
Q: So he never did really threaten you?
A: No, sir.

14. The defendant cites *United States v. Payero,* 888 F.2d 928, 929 (1st Cir.1989); *United States v. Laing,* 889 F.2d 281, 289 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990); and *United States v. Power,* 881 F.2d 733, 736 (9th Cir.1989), for the proposition that a weapon must be hidden to embolden a defendant. These cases involved situations in which the weapon *happened* to be hidden; they did not hold that the weapon *had* to be hidden in order for it to embolden the defendant.

inhabitant of the United States. In *Maravilla*, the defendants argued that "a foreign person who visits the United States very briefly, one who does not intend to stay even overnight, one, rather, who intends to stay within the United States for no more than a few hours" was not an inhabitant. *Id.* at 224. The court agreed, noting "no court that we know of has ever used [the word inhabitant] to apply to so temporary a foreign visitor as [the victim], one who lacks an intent even to spend a night." *Id.*

Orozco, however, was not "so temporary a foreign visitor" as to preclude a finding of inhabitant status. We note at the outset that as a matter of statutory construction, at least *some* aliens must qualify as inhabitants, for the statute specifically punishes those who, acting under color of law, subject an inhabitant "to different punishments ... on account of such inhabitant being an alien." Orozco fits into this protected category.

At trial, Orozco testified that she was an illegal alien living on San Bernardo Street in Laredo, Texas, at the time of the detention and assault (January 10). Galvan, her companion, testified that he picked her up from her apartment [15] that afternoon, and was driving her back when the two were stopped by Contreras. In addition, a police officer testified that she picked up Orozco at her apartment the day after the incident in order to escort her to the lineup. Finally, another officer testified that he went to Orozco's apartment in order to confirm that she lived there. Moreover, it is not inconsistent for Orozco to have kept an apartment in Laredo, Texas, in January (thus qualifying her as an "inhabitant"), while spending time at her family residence in Nuevo Laredo, Mexico, in May.[16]

We therefore find that there was sufficient evidence from which the jury could conclude that Orozco was an inhabitant of the United States on January 10. We need not establish a precise definition of "inhabitant" for purposes of the statute; rather, we hold that Patricia Orozco's presence in the United States was sufficiently permanent for her to qualify as an inhabitant under the statute.

### B.

Contreras also suggests that the rule of lenity requires us to construe the term "inhabitant" in his favor. We disagree. The defendant cites *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958) (emphasis added), which suggested that the rule of lenity

means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual *when such an interpretation can be based on no more than a guess as to what Congress intended.*

We have more than a "guess" to go on in this case, however.

The First Circuit in *Maravilla* conducted an exhaustive search of the legislative history surrounding Congress's use of the term inhabitant. 907 F.2d at 225–26. The court concluded that it "agree[d] with the government that Congress intended the provision to have a broad scope." *Id.* Its

---

**15.** Galvan testified as follows:

Q: Did you meet other ... friends that day?
A: Yeah. We went and picked up Patricia at her apartment, and from there we took off to another two friends['] houses....
Q: Where was Patricia's apartment?
A: It's a motel. Pan American. Pan American Motel. We picked her up there at the apartment.
Q: I know it's a motel, but do they have like long-term people, people that live there?
A: I don't know, but—I'm not sure, but I mean, I heard that they have—they went for weeks, by the month, days.

**16.** At oral argument, there was some question as to whether the indictment in this case made inconsistent allegations as to Orozco's status. Counts one and two charged that in January 1990, Contreras violated the civil rights of Orozco, "who was then an inhabitant of the State of Texas." Counts four and five charged that in early May, Contreras conspired and attempted to kill Orozco at her "residence" in Mexico. We find that the two descriptions are not inconsistent (although the indictment could have been drafted with more care) and that the indictment sufficiently informed Contreras of the charges against him. *See United States v. Hatch*, 926 F.2d 387, 391–92 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2239, 114 L.Ed.2d 481 (1991).

reading of the legislative history excluded only those "temporary visitors" such as the victim in *Maravilla,* who, according to uncontradicted evidence, intended to stay in the country for only a few hours. *Id.*[17] Based upon our conclusion that Orozco was more than a temporary visitor, we find that the rule of lenity has no application in this case.

Our finding is supported by the fact that the concerns underlying the rule of lenity are not implicated here. Contreras cannot claim that he was an innocent citizen "surprised by being prosecuted for acts that [he] could not know were criminal." *United States v. Singleton,* 946 F.2d 23, 24 (5th Cir.1991). Indeed, the rule of lenity "reduce[s] the likelihood that innocuous conduct will be penalized." *United States v. Palmer,* 864 F.2d 524, 528 (7th Cir.1988) (quoted in *United States v. Wake,* 948 F.2d 1422 (5th Cir.1991)), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1029 (1989). As the *Maravilla* court noted,

> [w]e assume that the statute, though criminal, is (in part) jurisdictional in nature, permitting the federal government to prosecute behavior that perpetrators know to be criminal (such as murder), and that consequently courts might give its language a broad interpretation without running afoul of 'due process' 'fair notice' requirements.

907 F.2d at 224. Contreras's conduct was not the sort of arguably innocent behavior the rule of lenity seeks to protect. We therefore affirm Contreras's convictions under counts one and two for violating Orozco's civil rights.

### VII.

We find that the evidence is sufficient to sustain Contreras's conviction for attempting to kill Orozco in order to prevent her from testifying, for conspiring to do so, and for using a firearm in connection with the initial assault and the eventual attempt

on Orozco's life. We also find that Orozco's stay in the United States at the time of the assault was sufficiently permanent for her to qualify as an "inhabitant" for the purpose of the applicable statute. Finally, we find that the district court's instructions to the jury as to attempt did not constitute plain error. We therefore AFFIRM the conviction on all counts.

---

**17.** The *Maravilla* court took pains to distinguish *United States v. Otherson,* 637 F.2d 1276 (9th Cir.1980), *cert. denied,* 454 U.S. 840, 102 S.Ct. 149, 70 L.Ed.2d 123 (1981), in which border patrol agents beat several illegal aliens whom they picked up near the border. The *Maravilla* court noted that "we can understand how one might 'presume' that an alien victim found in the United States intended to stay for some time." 907 F.2d at 227.